**UNITED STATES of America,**

v.

**James BURKE, Larry D. Evans, Prudence Clark and Jeffrey Kasner, a/k/a "Jeff Kanter," Defendants.**

**No. 88 Cr. 722 (MBM).**

United States District Court,
S.D. New York.

July 21, 1989.

**1132**

Henry Pitman, Asst. U.S. Atty., Benito Romano, U.S. Atty., S.D.N.Y., New York City, for the Government.

Seth F. Kaufman, Marion Bachrach, Summit, Rovins & Feldesman, New York City, for defendant James Burke.

Jack Lipson, Federal Defender Services Unit, The Legal Aid Society, New York City, for defendant Larry Evans.

David Gordon, New York City, for defendant Prudence Clark.

Don Buchwald, Buchwald & Kaufman, New York City, for defendant Jeffrey Kasner.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendants James Burke and Larry D. Evans move pursuant to Fed.R.Crim.P. 12 and 41 to suppress all evidence seized in three separate searches. The indictment in this case charges defendants with mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. Burke and Evans were principals of Barclay Galleries; Prudence Clark and Jeffrey Kasner worked as sales-

---

**1.** Defendants Clark and Kasner join in the other defendants' motion and seek suppression of all items seized from them and their work areas as a result of the searches.

**2.** Webster's Third New International Dictionary defines a boiler room as "a room equipped with many telephones and used for high-pressure selling of stock securities that are often without real value." at 247 (1986). Similarly, one court has described a securities "boiler room" as follows:

---

persons for Barclay.[1] In April 1984, United States Postal Inspector Robert DeMuro and other members of the United States Postal Inspection Service began investigating the authenticity of Salvador Dali prints Barclay was selling. (DeMuro Aff. at ¶ 2) In April 1985, DeMuro, Joseph Morahan, and Robert Paschel applied for search warrants for three separate Barclay offices in, respectively, Manhattan, Southampton, and Stamford. These warrants were executed on April 22, 1985.

The question presented here is twofold: (1) whether the warrants issued were unconstitutionally overbroad, and (2) whether the good faith exception to the warrant requirement applies such that suppression is inappropriate. As detailed below, I find that, although the warrants were overbroad, the circumstances of the searches show conclusively that the good faith exception applies to these searches. Defendants' motion to suppress evidence therefore is denied.

### I.

In order to consider the constitutionality of the searches, it is necessary to describe the genesis of the warrants. DeMuro reviewed material relating to five search warrants that the Postal Inspection Service had submitted in an earlier investigation into a "boiler room sales operation," [2] and, based on these models, prepared draft search warrants for the three Barclay locations. (DeMuro Aff. at ¶ 3) At that time, DeMuro had participated in the preparation or execution of at least 20 search warrants, including at least ten searches executed in connection with mail fraud investigations. (DeMuro Aff. at ¶ 3) Additionally, DeMuro

Boiler room activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer.

*United States v. Brien,* 617 F.2d 299, 302 n. 5 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

had been a postal inspector for about 11 years and had specialized in the investigation of boiler room sales operations in the two years before the searches in question here. (DeMuro Aff. at 2)

In the course of the Barclay investigation, DeMuro consulted two experts on Salvador Dali: Albert Field and Robert Descharnes. DeMuro also reviewed a report prepared by a third expert, A. Reynolds Morse. DeMuro described his consultations with Descharnes and Field and his review of Morse's report in the affidavit he drafted to support the government's application for a search warrant. In his search warrant affidavit, DeMuro referred to Field, Descharnes and Morse as Experts A, B and C, respectively. He did not identify them by name because of the government's perceived need to preserve their ability to work undercover. (DeMuro Aff. at ¶ 5) In particular, the affidavit recounts that Field said that the prints "Caesar in Dalivision" and "Dali's Final Vision," offered for sale by Barclay, were fake Dali artwork, although they were based on a "Dali image"; Field and Morse said that the print "Cosmic Warrior," also offered for sale by Barclay, was also a fake and not even based on a "Dali image." (DeMuro Supporting Aff. to Search Warrant (hereafter "DeMuro Search Warrant Aff.") at ¶¶ 14–22) The affidavit reported that all three experts concluded that "none of the Barclay images they have reviewed were signed or numbered by Dali after printing." (DeMuro Search Warrant Aff. at ¶ 24)

The parties hotly dispute the credentials of these three individuals. According to DeMuro, Field is Dali's "official archivist and has devoted the last thirty years of his life to compiling a definitive catalogue of Dali's works." (DeMuro Aff. at ¶ 4) He first learned of Field when he asked the International Foundation for Art Research ("IFAR") to authenticate a Dali lithograph Barclay had sold; IFAR's report relied on opinions by Field and Morse, both of whom it termed "recognized experts." (DeMuro Sur–Reply Aff. at ¶¶ 3, 4) After receiving this report, DeMuro contacted Field directly and met with him several times in late 1984. DeMuro avers that,

In all my conversations with Field, he consistently appeared to be extremely knowledgeable about Salvador Dali. I also learned that Field had met Dali personally on several occasions and that Dali himself had approved of Field's efforts to assemble and to publish a definitive catalogue of Dali's works. To that end, Dali had supplied Field with a letter that identified Field as his official archivist.

(DeMuro Sur–Reply Aff. at ¶ 5 & Exh. A) Field's status as Dali's archivist has been acknowledged by Barclay itself in its sales literature. (DeMuro Aff., Exh. A at 3) In fact, at one point, Barclay sought out Field to authenticate some of the purported Dale lithographs and etchings it was selling. (DeMuro Aff. at ¶ 3, Exh. B) In the ensuing February 13, 1985 written contract memorializing an agreement between Field and Barclay, defendant Larry Evans referred to Field as "perhaps the leading Dali expert in the Country." (DeMuro Sur–Reply Aff. at ¶ 6, Exh. B) Also in February 1985, DeMuro read a *New York Magazine* article which reported that an entity called the "Collector's Guild" has sought Field's opinion about the authenticity of a Dali lithograph. (DeMuro Sur–Reply Aff. at ¶ 7, Exh. C) DeMuro avers that, in late 1984, the New York State Attorney General's Office informed him that it regarded Field as an expert and that it had consulted him as such regarding its investigation of fake Dali lithographs. (DeMuro Sur–Reply Aff. at ¶ 8)

According to DeMuro, Robert Descharnes was a professional photographer of Dali's works who served as Dali's personal secretary from 1981 until Dali's death on January 23, 1989. (DeMuro Aff. at ¶ 4; DeMuro Sur–Reply Aff. at ¶ 11) IFAR and Michael Ward Stout, Dali's attorney in the United States, referred DeMuro to Descharnes, noting that Descharnes was an expert in Dali artwork. (DeMuro Sur–Reply Aff. at ¶ 11) A. Reynolds Morse was the founder and director of the Salvador Dali Museum in St. Petersburg, Florida. *Id.* Barclay's sales literature states that this museum contained the world's largest col-

lection of Dali's works. (DeMuro Aff., Exh. A at 3) DeMuro avers that Stout also told him that both Field and Morse were experts in Dali work and that both had had long personal relationships with Dali. (De-Muro Sur–Reply Aff. at ¶ 9) Moreover, a *Wall Street Journal* article in March 1985 identified Morse as "a major U.S. Collector of Dali's works and the director of the Salvador Dali Museum in St. Petersburg, Fla." (DeMuro Sur–Reply Aff. at ¶ 10)

Defendants question whether these experts are "experts in the field of art with particular expertise in the work of Salvador Dali" as DeMuro described them in his affidavit supporting the application for a search warrant. (Kaufman Decl., Exh. A at 5) According to defendants, Field is a "retired New York City school teacher with what appears to be an abiding interest in Dali." (Bachrach Decl. at ¶ 5; *see also* Kaufman Aff. at ¶ 9) According to defendant's lawyer, Field "has no educational background in art; he appears never to have studied art or art history or even to have taken a course in Dali or Surrealism." (Kaufman Decl. at ¶ 9) Moreover, when questioned about his background, Field reportedly stated: "I'm not interested in art or art history. I'm interested in Dali." (Kaufman Decl. at ¶ 10) Defendants' lawyer claims that Morse similarly has no training in art or art history, describing him as a "wealthy businessman who over the years collected a lot of Dali art work, and then created a Dali Museum to house a sizable amount of Dali works valued at some $35 million at the time." (Kaufman Decl. at ¶ 12) Finally, defendants dismiss Descharnes as a "secretary" for Dali. (Bachrach Decl. at ¶ 5) Defendants claim that each of the three had a personal financial interest in restricting the supply of Dali lithographs in order to increase the value of his own holdings. Claiming that Dali freely handed out blank pages with his signature and changed his signature frequently, defendants assert that no one knows for sure what is an authentic Dali and what is a fake. Hence, according to defendants, these experts had both motive and opportunity to discredit defendants' Dali prints in order to buttress the authenticity and enhance the value of their own Dali collections.

DeMuro submitted his draft search warrant and supporting affidavits to an Assistant United States Attorney in this District for comment and approval. (DeMuro Aff. at ¶ 6) The search warrant for the Barclay location in Manhattan was issued by United States Magistrate Michael H. Dolinger on April 19, 1985; United States Magistrate Thomas Smith of the District of Connecticut issued the warrant for the Stamford gallery on April 22, 1985; United States Magistrate Shira Scheindlin of the Eastern District of New York issued the Southampton warrant on April 22, 1985. The proposed warrants submitted to all three magistrates were identical in their descriptions of the items to be seized; the affidavits were similar.[3] Although DeMuro says that he told Magistrate Dolinger orally that Field was Dali's official archivist, there is no written record of these remarks and the parties agree that this statement should be disregarded by the court in considering whether the affidavit submitted in support of the search warrant establishes probable cause. (Pitman Aff. at ¶ 5)

Searches pursuant to all three warrants were executed simultaneously on April 22, 1985. Before the searches, the postal inspectors who were to conduct them met, and each was provided with a copy of the warrant and affidavit; the scope of the search was fully discussed. (DeMuro Aff. at ¶ 9) Moreover, the three officers who swore out the supporting affidavits for the search warrants—DeMuro, Morahan, and Paschel—participated in the searches of, respectively, the Manhattan, Southampton and Stamford locations. (Pinorsky Aff. at ¶ 2 & Exh. A)

## II.

### A. *Standing*

■■■ "The proponent of a motion to suppress has the burden of establishing

---

**3.** Accordingly, when discussing the supporting affidavits, I will refer only to the DeMuro affidavit.

that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). An individual must demonstrate that he had a legitimate expectation of privacy in the searched area, *Rawlings v. Kentucky*, 448 U.S. 98, 100, 100 S.Ct. 2556, 2559, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980); *United States v. Chen*, 629 F.Supp. 263, 269 (S.D.N.Y.1986), for it is the expectation of privacy, not simply ownership of property or possession, that establishes a Fourth Amendment interest. *Chen*, 629 F.Supp. at 269. However, businessmen have a constitutional right to conduct their business free from unreasonable official entries upon their private property. *Mancusi v. DeForte*, 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968). Similarly, employees may have a reasonable expectation of privacy against intrusion by law enforcement authorities. *O'Connor v. Ortega*, 480 U.S. 709, 716, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987). Ownership or control of the company, participation in its affairs, and regular presence at its offices are all factors which are relevant to a determination of whether an individual has a "reasonable expectation of freedom from governmental intrusion." *Mancusi*, 392 U.S. at 368, 88 S.Ct. at 2124.

> Defendants' lawyer has sworn that Upon information and belief ... the defendants James Burke and Larry Evans were both principals of Barclay and had managerial responsibility for the day-to-day operations of Barclay at the time the warrants were executed. Defendants Prudence Clark and Jeffrey Kasner were members of the sales staff of Barclay.

(Kaufman Decl. at ¶ 5) The government argues that this information-and-belief averment from defendants' lawyer is insufficient to confer standing because it is not first-hand evidence. *United States v. Middleton*, 85 Cr. 812 (CSH), slip op. at 7 (S.D.N.Y. January 10, 1986); *United States v. Shakur*, 560 F.Supp. 358, 359–60 & n. 1 (S.D.N.Y.1983) and cases cited therein. However, defendants note that the indict-

ment itself contains information which demonstrates that all defendants have standing. The indictment asserts that Burke "had overall managerial responsibility for Barclay" and that he participated in the day-to-day operations of Barclay. (Indictment at ¶ 4) The indictment also alleges that Burke was a member of Barclay's Board of Directors. *Id.* Similarly, the indictment alleges that Evans was President of Barclay and exercised managerial responsibility there. (Indictment at ¶ 5) In support of its memorandum in opposition to this motion, the government attached as an exhibit a Barclay newsletter which reflects Evans' status as President of Barclay. The indictment also states that Clarke was the immediate supervisor of the sales staff at Barclay. (Indictment at ¶ 6) Finally, the indictment alleges that Kasner was a salesman at Barclay. (Indictment at ¶ 7) While defendants' lawyer's affirmation alone may not be sufficient, given that the premises here are admittedly not a third person's property for which a showing on personal knowledge would be necessary, the affirmation and indictment together are sufficient to show that defendants had a reasonable expectation of freedom from government intrusion. *See United States v. Jones*, 851 F.2d 1131, 1136 (9th Cir.1988) (*per curiam*) (court considers allegations in indictment along with defendant's affidavit in finding standing). Given this evidence, I find that the defendants have standing to contest the searches here. *Accord United States v. Schwimmer*, 692 F.Supp. 119, 125 (E.D.N.Y.1988) (president and owner of company had legitimate expectation of privacy in entire suite of offices); *see also United States v. Leary*, 846 F.2d 592, 595–96 (10th Cir.1988) (corporate officers and employees have legitimate expectation of privacy in corporate office).

### B. *Probable Cause*

Defendants first challenge whether the affidavits presented to the issuing magistrates establish probable cause to believe that Barclay was engaged in fraud. The Fourth Amendment provides that warrants shall issue only upon a showing of "probable cause, supported by Oath or affirma-

tion." U.S. Const. amend. IV. Defendants argue that the DeMuro affidavit is insufficient because it failed to identify the experts and failed to provide information from which the magistrate could conclude that these experts were reliable.

■ Whether there is "probable cause" to support the issuance of a search warrant is a "commonsense, practical question" that must be decided by the issuing court viewing the "totality-of-the-circumstances" on a case-by-case basis. *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). It is clear that " 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *Gates*, 462 U.S. at 235, 103 S.Ct. at 2330 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)). Thus, it is sufficient if there is a fair probability that a search will yield the evidence specified in the warrant. *Gates*, 462 U.S. at 246, 103 S.Ct. at 2336; *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (Probable cause deals not " 'with hard certainties, but with probabilities' ") (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). That an innocent explanation also may be consistent with the facts alleged does not negate probable cause. *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985); *United States v. Ivic*, 700 F.2d 51, 57 (2d Cir.1983); *United States v. Webb*, 623 F.2d 758, 761 (2d Cir.1980).

In this inquiry, a search warrant is presumed valid. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).[4] Furthermore, where, as here, the warrants were issued by a magistrate, the court reviewing the sufficiency of the affidavits must give the magistrate's determination " 'great deference.' " *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) (quoting *Spinelli*, 393 U.S. at 419, 89 S.Ct. at 591); *Travisano*, 724 F.2d at 345. *See also Gates*, 462 U.S. at 237 n. 10, 103 S.Ct. at 2331 n. 10 ("[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate has a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.")

■ With these principles in mind, I turn to defendants' challenges to the sufficiency of the affidavits. Defendants bore in on the three experts DeMuro relied on to prove his claim that defendants lied to potential customers about the authenticity of the Dali prints. Defendants insist that the affidavits should have identified the experts, detailed their expertise and knowledge, and stated whether and how the experts examined the questioned artwork. Defendants argue that the magistrates could make no independent finding of probable cause absent such information that they could evaluate. Regarding the failure to identify the experts, I find that the government had a legitimate reason not to divulge their names at the time. In April 1985, the government was investigating what appeared to be an international conspiracy regarding the sale of fake Dali prints. One of the government experts— Field—had operated in an undercover capacity in this case and, according to DeMuro,

> it was hoped that he and the other experts might be used in an undercover capacity in connection with the larger investigation. Accordingly, the govern-

---

4. Defendants in their first brief on this motion requested a *Franks* hearing to determine whether the postal inspectors had willfully or recklessly misled the issuing magistrates. At oral argument, however, defendants as well as the government explicitly waived any right to a hearing. (6/23/89 Tr. at 2, 3, 45) Even if defendants' request for a hearing was not waived, for the reasons set forth below, I find that defendants have failed to meet their burden in seeking a *Franks* hearing of showing that the affidavit contained knowing or reckless falsehoods or omissions that were material on the issue of probable cause. *Schwimmer*, 692 F.Supp. at 125 ("If, after setting aside challenged material and considering omitted material, the Court still concludes that probable cause has been shown, then no hearing is required.") *See also United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.) (citing *Franks* ), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985).

ment believed it necessary to take all steps possible to preserve the anonymity of its experts so that their viability as undercover operatives would not be compromised.

(DeMuro Aff. at ¶ 5) Although defendants argue that the sealing of the affidavits provided sufficient confidentiality, the government rightly responds that, at the time, there was no assurance how long the affidavits would remain sealed after execution. Accordingly, I find that the government had a valid and compelling interest in withholding the experts' names.

■■■ Defendants belittle the value of expert opinion here. They note that some courts have questioned the value of government expert opinion in showing probable cause. Although "expert opinion is an important factor to be considered" in reviewing a warrant application. *Fama*, 758 F.2d at 838, courts have indicated that a *government agent's* opinion standing alone "might not be sufficient" to show probable cause. *United States v. Benevento*, 836 F.2d 60, 71 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *United States v. Gomez*, 652 F.Supp. 461, 463 (E.D.N.Y.1987). First, the concerns expressed in *Gomez* and *Benevento* of agents turning themselves into instant experts on any subject, *Gomez*, 652 F.Supp. at 463, are in no sense applicable here. All three men relied on by DeMuro were knowledgeable about Dali's work based on their activities, whether vocational or avocational, that had nothing to do with any service they rendered to the government. Even if Field's undercover work rendered him in a sense a government agent, he was a Dali expert turned agent, not an agent turned Dali expert,

which is what would arouse the suspicion of the *Benevento* and *Gomez* courts. Additionally, all three experts came to the same conclusion that Barclay was dealing in fake Dali prints; IFAR, an independent organization about which there has been no allegation of bias, confirmed that some of the Dali works sold by Barclay were fake. (DeMuro Search Warrant Aff. at ¶ 13) Finally, given the specialized nature of the question here—whether certain prints were forgeries or not—I question how the government could establish the elements of the crime without the assistance of art experts.

Moreover, I find inapposite cases defendant cites where courts found insufficient probable cause because the affiant failed to reveal certain facts about informants. Defendants' argument that DeMuro misled the magistrate by describing them as "art experts" is faulty. There has been no showing that these experts are not what DeMuro claimed them to be in his affidavit: "[art] experts *with particular expertise in the work of Salvador Dali.*" (DeMuro Search Warrant Aff. at ¶ 8 (emphasis added)) Although Field, Morse and Descharnes were neither trained nor affiliated academically in a way that allowed them to lay claim to the title of expert, that title, depending on the discipline, may be acquired outside the academy as well. In particular, experience may confer the title. *See* Webster's Third New International Dictionary at 800 (an expert is "one who has acquired special skill in or knowledge of a particular subject through professional training *or practical experience* ") (emphasis added). Given what DeMuro knew about these individuals at the time, *see* pp. 3–5, and what we know about them today,[5]

---

5. DeMuro notes that a recent book about the worldwide sale of fake Dali prints, *The Dali Scandal* by Mark Rogerson, attests to Field's and Morse's special knowledge of Dali's work. (DeMuro Sur–Reply Aff. at ¶ 14) Field appeared on the television show "Sixty Minutes" in December 1987 and was identified as an expert on Dali's work. *Id.* at ¶ 17. The director of IFAR, Virgilia Pancoast, routinely recommends Field and Morse as experts in Dali's work. *Id.* at ¶ 19. Field has testified as an expert in a New Mexico criminal case. *Id.* at ¶ 16. Both Reva Castelman, Print Curator at the Museum

of Modern Art, and Marin Gordon, President of the International Fine Print Dealers Association, consider Field the top expert on Dali in the United States. (Ellis Sur–Reply Aff. at ¶¶ 2, 3) Additionally, Field testified as an expert witness in Dali lithographs in New York state court. Although there, as here, defendants' lawyers revealed that Field has little formal education in art history or art appreciation (Bachrach Decl. at ¶ 6), Justice Haft admitted Field as an expert, noting "[B]ased upon what [Field] said, he is undoubtedly the world's greatest expert on Sal-

they certainly had such knowledge of *Dali's* art that they could distinguish a real Dali from a fake. As Field told defendants' investigator, "I am not interested in art; I am interested in Dali." (Kaufman Decl. at ¶ 10)

Other than conclusory allegations of bad motive, defendants have not presented any evidence to support their contention that these experts were biased. Nor have defendants presented anything in these experts' backgrounds which would have given the magistrates pause. The only concrete allegation defendants have made—that these experts owned many Dali prints—is without substance. It is natural that one knowledgeable about a prolific modern artist would own that artist's work; to the extent that mere ownership is evidence of bias, virtually any modern art expert would be suspect. There has been no showing that these individuals were hiding motives comparable to those of the informants in cases defendants cite where no probable cause was found. *United States v. Jackson*, 818 F.2d 345, 348 (5th Cir.1987) (informant described by the Court as "an admitted perpetrator of the crime in question [with] reason to shade any information he gave in order to exculpate himself or to curry favor with officials."); *United States v. Granger*, 596 F.Supp. 665, 669 (W.D.Wis.1984) (informant was prisoner who had motive to fabricate; by implicating another prisoner in the death of a prison employee, he removed suspicion from himself). Also inapposite is *United States v. Barrington*, 806 F.2d 529, 531 (5th Cir.1986), where there was no information whatsoever regarding the informant's ability to perceive the facts about which he provided information. Here, the affidavits stated that the experts' opinions were based on their personal knowledge and observations. (DeMuro Search Warrant Aff. at ¶ 3(d)) In sum, I find that the search warrant affidavits sufficiently described these experts; a rendition of their back-

grounds was superfluous. In order to show probable cause, it is not necessary for the government to show fraud beyond a reasonable doubt, nor to dispel every question regarding the validity of the expert opinions on which the government bases its showing of probable cause. Rather, the government need show only that it had a sound basis for relying on the experts' judgment. Based on all the facts presented here, I find that the government had more than sufficient reason to rely on these experts' judgment. As for defendants contention that the experts should have stated the reasons for their determination that the Barclay prints were fakes, there is no reason why they must detail the reasons for their conclusion, any more than a handwriting expert has to detail why he concluded the handwriting was defendant's or a fingerprint expert that the prints were defendant's.

In any event, the experts' opinions are not the sole basis for probable cause in this case. Even excluding the expert's opinions, DeMuro's affidavit contains enough evidence that Barclay's activities were illegal to demonstrate probable cause. DeMuro had specialized in the investigation of boiler room sales frauds for approximately two years. (DeMuro Search Warrant Aff. at ¶ 4) DeMuro's investigation of the Barclay operation convinced him that it was a boiler room operation. *Id.* ¶ 6 Two confidential sources described Barclay's offices in such a fashion that DeMuro concluded that it resembled a boiler room operation. *Id.* at ¶ 29 One confidential source even provided a diagram of the offices; that diagram was attached to the affidavit. *Id.* at ¶ 29 & Exh. H Another confidential informant recognized an individual at Barclay's offices who was known to have worked previously in similar boiler room operations. *Id.* at ¶ 31 DeMuro stated that Barclay salespeople misrepresented at least five times that Barclay had been in business for "several" years to twelve

---

vador Dali and his work. In fact, there may not be another expert with anything like his qualifications." *Id.* at ¶ 15 & Exh. D. There is available at a current Dali exhibition (May 9—October 29, 1989) at the Scuola Grande San Teodoro

in Venice, entitled "Dali, Scultore e Illustratore," an illustrated text entitled *Dali Nella Terza Dimensione* (Master Fine Art, Milan, 1987); two of its three authors are Field and Morse.

years, when in fact it had been incorporated only two years before, in 1983. *Id.* at ¶ 25 & Exh. G Even without the experts' opinions, these facts, when taken together, amply support a finding of probable cause.

Thus, even if I were to accept defendants' claim that the government failed to identify the experts sufficiently and to provide enough background information about them, there is still ample basis in the affidavit to support a finding of probable cause.

### C. *Particularity of the Warrant*

Defendants contend also that the identical warrants are overbroad and fail to state with particularity the items to be seized. The warrants here authorized the seizure of the following items:

documents, books, ledgers, records and objects including but not limited to files; records of completed sales; customer correspondence; personnel files, payroll records; lists of employees; employee compensation records for all employees, including, but not limited to, salesmen, promoters, "Art Consultants" and "Assistant Curators"; records of payments to shareholders; financial records[;] customer account statement sheets; bank records, including but not limited to cancelled checks, monthly account statements and deposit slips; cash receipt and disbursement records; sales literature; sales training materials; sales literature; sales training materials; written sales pitches and program descriptions; tape recordings relating to sales business and voices; customer contracts; business contracts; agreements; applications; certificates; certificates of authenticity; curators' recommendations and records; lists of curators; curator contracts; calendars; internal memoranda and handwritten notes; diaries; key punch computer cards; computer floppy disks and diskettes; computer printout sheets with printouts of Information Systems Design programs; computer memory banks; computer tapes or other data storage devises; prints attributed to Salvador Dali[;] other works of art attributed to Salvador Dali; lead cards; lead sheets; lead source material, printe[d] lithographic and etching plates; and incorporation and partnership records whether in document or tape recorded form; including those located in briefcases; portfolios, purses or other personal carriers.

The government insists this warrant is not overbroad, *United States v. Buck,* 813 F.2d 588, 591–92 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987), but that even if it is, two arguments forestall suppression: (1) the breadth of the warrant was justified by probable cause to believe that Barclay was a pervasively fraudulent enterprise, *National City Trading Corp. v. United States,* 635 F.2d 1020, 1024–26 (2d Cir.1980), and (2) the officers relied in good faith on the validity of the warrant. *Leon,* 468 U.S. 897, 104 S.Ct. 3405. I will consider each of these contentions in turn.

### 1. *"All–Records" Exception*

■ When there is probable cause to believe that a business is pervaded with fraud, seizure of all records is appropriate and, thus, a broad warrant would pass constitutional scrutiny. *United States Postal Serv. v. C.E.C. Servs.,* 869 F.2d 184, 187 (2d Cir.1989) (Winter, J.); *National City Trading Corp.,* 635 F.2d at 1024–26. *See also United States v. McClintock,* 748 F.2d 1278, 1282–83 (9th Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985); *United States v. Offices Known as 50 State Distributing Co.,* 708 F.2d 1371, 1372–75 (9th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); *United States v. Brien,* 617 F.2d 299, 309 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). This is known as the "all records" exception to the particularity requirement.

■ In order to fall within the "all records" exception, it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud. Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from

which a magistrate could infer that those activities are "just 'the tip of the iceberg.' " *50 State,* 708 F.2d at 1375 (quoting *Brien,* 617 F.2d at 308). That evidence could consist of a large number of fraudulent transactions or of documentation—in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation—that the entire operation is a scam. For example, in *Brien,* the affidavit stated that various government agencies had received 250 complaints about the enterprise's fraudulent activity; the affiant's conclusion that the entire business was fraudulent was based also on interviews with 20 former employees. From this information, the court found, one could infer that the 250 instances were part of a pattern of fraud permeating the business. In *National City Trading Corp.,* 635 F.2d at 1021–22, the affidavit listed 40 complaints; on three separate occasions, undercover government agents visited the company with victims. In *United States Postal Serv. v. C.E.C. Servs.,* Civ. 87–1076E, slip op. at 9–10, 1988 WL 81766 (W.D.N.Y. July 31, 1988), *aff'd,* 869 F.2d 184 (2d Cir.1989), the district court found that "[t]he affidavits . . . sufficiently establish probable cause that all or most of CEC's activities related to mailing and solicitations involving the Canadian Lottery," activity which is itself illegal. "In particular, the interview with [CEC] employee Jones, establish that there were fifteen employees such as herself who were involved in the sales of 'spots' in the Canadian Lottery." *Id.* at 9–10. The court thus found that the affidavit set forth sufficient evidence from which one could infer that the entire business was fraudulent.

■ The government contends that the DeMuro affidavit sets forth evidence from which one could conclude that Barclay was a pervasively fraudulent enterprise. The warrant affidavit describes fraudulent transactions involving six customers who purchased Dali prints. (DeMuro Search Warrant Aff. at ¶¶ 9–20) The affidavit also describes four fraudulent statements about Dali prints made to a seventh customer, *Id.* at 23, as well as several misrepresentations about Barclay and the prints it

sold. *Id.* at ¶¶ 24, 25. The affidavit also recites that DeMuro believed that the operation was a boiler room operation, employing high-pressure telephone sales. (DeMuro Aff. at ¶¶ 4, 5, 6) DeMuro describes Barclay's New York location as follows:

> [Confidential] Source A has told your deponent that in Barclay's offices there are filing cabinets and cabinets to house prints, approximately seven desks with telephones, a postage meter machine, computer input machines; and a telex machine. During a visit to Barclay in mid-February 1985 Confidential Source A viewed the operations and told your deponent that many employees were talking on the phone, that other employees were stuffing advertisements into envelopes to be mailed or transported by private couriers, that an employee was observed working at a computer, and that a large "Sales Chart" bearing the names of sales people and their sales hung on a wall behind one of the principal's desk.

*Id.* at ¶ 29. Barclay's office in Stamford, Connecticut is described in a similar fashion as a boiler room operation by the affiant. (Paschel Search Warrant Aff. at ¶¶ 29, 30) However, Barclay's Southampton office contained substantial exhibition space as detailed in Morahan's affidavit. (Joseph P. Morahan Search Warrant Aff. at ¶ 29) Furthermore, affiant Morahan's description of DeMuro's visit to the gallery demonstrates that DeMuro knew Barclay was selling more than Dali prints:

> Inspector DeMuro has told your deponent that the 61 Hill Street address is an art gallery open to the public; the gallery consists of four floors or viewing levels; that framed prints and pictures are displayed on the walls, *including* three works attributed to Salvador Dali. . . .

*Id.* (emphasis added) This conclusion is buttressed by the numerous Barclay advertisements the government has appended showing that Barclay sold works of artists other than Dali. (DeMuro Aff., Exh. A)

Notably absent from the two affidavits filed by DeMuro on this motion is any

indication that the government believed—however incorrectly—that Barclay's sale of non-Dali artwork was also fraudulent or that Barclay's sale of fraudulent Dali artwork represented just a sample of its pervasively fraudulent sales. Although fraudulent activities in one line of business may show that others too are fraudulent and, thus, be sufficient to uphold a broadly-written warrant, this is not such a case. To the contrary, as DeMuro's affidavit makes clear, the government long before these searches had limited its investigation of Barclay to the sale of Dali prints: "Based on the information set forth below, there is probable cause to believe that mail fraud ... and wire fraud ..., *involving the sale of purported fine art prints by Salvador Dali*, has been committed by The Barclay Gallery Ltd." (DeMuro Search Warrant Aff. at ¶ 2); *50 State*, 708 F.2d at 1375 (distinguishing cases where the investigations had focused on a small segment of the business operation). Nor did the government make any showing that the sale of Dali prints was inseparable from the sale of prints by other painters. Moreover, as DeMuro well knew, Barclay itself was not *entirely* a boiler room operation such that one could infer from the very layout of its offices that it was engaged only in fraudulent activities. Therefore, the exception to the particularity requirement for premises that house pervasive fraud is not applicable here.

#### 2. "Good Faith" Exception

■ The government contends that, even if the warrants were overly broad, the evidence should be admissible under the reasonable reliance exception to the exclusionary rule set forth by the Supreme Court in *Leon*, 468 U.S. 897, 104 S.Ct. at 34. *Leon* confines the inquiry into whether the officers acted in good faith "to the objectively ascertainable question whether a reasonable well-trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23.

Under *Leon*, there are only four situations in which evidence seized in good faith pursuant to a defective search warrant will be suppressed: (1) where the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' " (3) where the issuing magistrate "abandoned his detached and neutral role;" and (4) where, "depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." 468 U.S. at 923, 104 S.Ct. at 3421.

I find that the circumstances of the searches here show powerful indicia of good faith, including the following four factors which are explained more fully below. First, the warrants were approved by no fewer than three federal court magistrates and an Assistant United States Attorney. Second, they had been patterned after search warrants used successfully in a prior boiler room investigation. Third, as the Second Circuit recognized in 1987, case law in this circuit in 1985 "left considerable ambiguity as to the exact requirements of the particularity clause going far beyond the ambiguity inherent in every new application of the law." *Buck*, 813 F.2d at 593. Under such ambiguous case law, I find that the warrants here were not so broad that no agent could in good faith rely on them. Fourth, although the affidavits, which limited the scope of the search to Dali artwork and documents related to Dali sales, were not attached to the warrants, and might not simply because of such attachment cure a particularity problem, *United States v. Marti*, 421 F.2d 1263, 1269–70 (2d Cir. 1970), the circumstances of the search reveal that, as a practical matter, these affidavits did limit the scope of the warrants. Each of the searching agents each was given a copy of the relevant affidavit, and the affiants participated in the searches. Moreover, notable by its absence, given the

extensive briefing of this motion, is any claim in defendants' papers that the government agents in fact carted away the entire office or took non-Dali artwork. In other words, no general search was conducted. To the contrary, government agents followed the limitations to the search warrants set forth in the affidavits. Although each of these factors standing alone might not be sufficient, given *all* the "circumstances of this particular case," *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421, most importantly that the officers here had taken "every step that could reasonable be expected of them" to comply with the Fourth Amendment's requirements, *Massachusetts v. Sheppard,* 468 U.S. 981, 989, 104 S.Ct. 3424, 3428, 82 L.Ed.2d 737 (1984); *Buck,* 813 F.2d at 592, I find that reasonable well-trained officers could not have known that the warrants were impermissibly broad and thus that the agents acted in good faith in executing these warrants.

Defendants mount three challenges to a finding of good faith.[6] First, they contend that the agents could not have relied on the warrants in good faith because the affidavits failed to show probable cause. Second, they claim that the affiants misled the issuing magistrates by falsely claiming that the three experts were in fact art experts. Third, brandishing a recent case in which the Ninth Circuit rejected a good faith argument involving a search warrant patterned after the ones at issue here, *Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747, 752–53 (9th Cir.1989), defendants assert that the warrants were so facially overbroad that no reasonable officer could rely on them.

The first two contentions I have already rejected in substance, *see* pp. 1136–38, and thus will only briefly address. This is not a situation where an officer obtained a warrant based on a "bare bones" affidavit and then relied on good faith execution by innocent colleagues in order to sustain the warrant. *United States v. Michaelian,* 803 F.2d 1042 (9th Cir.1986). The DeMuro affidavit, 18 pages long, is far from a "bare bones" affidavit. To the contrary, it details fraudulent activity involving seven of defendants' customers who purchased fake Dali prints, provides expert opinion to support these allegations, and also demonstrates that the layout of Barclay's operation and the presence of an individual known to be involved in previous fraudulent enterprises suggested that Barclay was a fraudulent enterprise. The affidavits were sufficiently detailed in showing probable cause such that the agents could rely on the warrants in good faith.

Nor can I credit defendants' claim that the affiants misled the issuing magistrates about the background of the experts and culpably failed to disclose disputes over the authenticity of Dali's works. As I have already stated, while the experts consulted by DeMuro may not have been academic art historians or critics, they were certainly *Dali* experts. Therefore, DeMuro described them accurately and truthfully when he stated that they were "experts in the field of art *with particular expertise in the work of Salvador Dali.*" (DeMuro Search Warrant Aff. at ¶ 8) (emphasis added) Given that the investigation involved only allegations of fake Dali prints, only specialists in Dali were needed. However, even assuming that these three experts were not in fact Dali experts, DeMuro had a good faith basis to believe they were. Barclay's own sales literature described Albert Field as Dali's archivist; Barclay itself tried to obtain Field's services in authenticating its works. Descharnes had been Dali's manager for five years; Morse was founder and director of the Salvador Dali Museum in St. Petersburg, Florida. From everything DeMuro knew about these indi-

---

**6.** Defendants briefly raise a fourth argument—namely, that the good faith exception should not apply because the magistrates allegedly abandoned their judicial roles in issuing the search warrants. Defendants, however, offer no proof in this regard other than to claim that the magistrates abandoned their neutral role by issuing warrants without probable cause. That bare allegation does not prove the type of conduct necessary to invoke this exception to *Leon. See, e.g., United States v. Whitehorn,* 829 F.2d 1225 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988) (magistrate's presence in FBI office while search warrant application prepared not an abandonment of judicial role). I thus reject it out of hand.

viduals, *see* pp. 1133–34, I find that DeMuro in good faith relied on them as experts.

Defendants assert that several newspaper articles have reported controversy among Dali experts over whether particular works were in fact signed by Dali and whether Dali authorized works executed by others (Kaufman Second Decl. at ¶ 10, Exh. 10), and argue that this controversy should have been disclosed to the magistrates in order to cast doubt on the conclusions of the government's experts. In a *Wall Street Journal* article dated March 8, 1985, Descharnes states that no one but Dali himself could detect a clever fake with certainty.[7] The article reveals also that Dali may have signed as many as 350,000 blank sheets during his career. The government contends that it is ludicrous to imagine that this article headlined, "Buyer Beware—The U.S. Art Market Is Said To Be Flooded With Dali Forgeries—Galleries, Mail Order firms Are Alleged To Sell Fakes With Phony Documents," would dissuade a magistrate from issuing search warrants for Barclay. Most importantly, defendants have failed to demonstrate the existence of any dispute among experts with respect to the particular prints appended to the search warrant affidavits. Defendants have thus failed to show that the government did not disclose materially important information. Moreover, as I held earlier, pp. 1138–39, even if one disregarded the experts' opinions that the prints were forgeries, the affidavits contained sufficient other evidence of fraudulent activity—from two confidential sources, DeMuro's opinion that Barclay was a boiler room operation, and the presence of an individual at Barclay known to have been involved in such fraudulent operations in the past—to support a showing of probable cause. Defendants' contention that DeMuro recklessly failed to disclose material information to the magistrates must fail.

Finally, defendants claim that the agents could not have relied on the warrants in good faith because the warrants were so facially invalid that no agent reasonably could have presumed them valid. Defendants cite the Ninth Circuit decision in *Center Art Galleries*, 875 F.2d at 751–53, which held that the warrant in a Hawaiian seizure of fake Dali prints, a warrant patterned after the ones here, was so facially invalid as to preclude good faith reliance. Defendants claim that *Center Art Galleries* controls here. In fact, defendants claim that the warrant in *Center Art Galleries* was more specific than the one here because the Hawaiian postal agents added the phrase "which are evidence of violations of federal criminal law" to the warrant. If a more narrow warrant was facially invalid, defendants argue, then these warrants are *a fortiori* invalid. For the reasons set forth below, I disagree.

First, defendants are incorrect that the warrants' wording here was so overbroad as to amount to a general warrant such that no officer could rely on it in good faith. *Buck* notes that, at the time these warrants were issued, Second Circuit case law was ambiguous on the exact requirements of particularity. 813 F.2d at 590–592. In particular, courts in this Circuit had sanctioned warrants with quite broad language. In *United States v. Zanche*, 541 F.Supp. 207, 209 (W.D.N.Y.1982), now-Chief Judge Curtin upheld a warrant authorizing seizure of "any and all business records relating to present and past disbursements and payments made by Gabriel's Services and Supply Corp." *See also United States v. LaChance*, 788 F.2d 856, 871 (2d Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986) (warrant authorized search for "documentary evidence of the involvement of [defendants] in the conspiracy"); *United States v. Vargas*, 621 F.2d 54, 56 (2d Cir.), *cert. denied*, 449 U.S. 854, 101 S.Ct. 150, 66 L.Ed.2d 68 (1980) ("documentary evidence relating to the smuggling of said cocaine from Lima, Peru to the United States" held sufficiently specific); *United States v. Scharfman*, 448 F.2d 1352, 1353 (2d Cir. 1971), *cert. denied*, 405 U.S. 919, 92 S.Ct.

---

**7.** I note that Descharnes' comment is limited to *clever* fakes and thus defendants avoid the question whether the prints at issue here were clever fakes or clumsy ones.

944, 30 L.Ed.2d 789 (1972) ("such books and records as are being used as means and instrumentalities of the above described crimes"); *United States v. Shakur*, 560 F.Supp. 337, 344 (S.D.N.Y.1983) ("[o]ther documents or evidence relating to or evidencing crimes committed by [certain organizations], [a]ll of which are fruits and instrumentalities of [bank robbery and conspiracy]"). Although the warrants here may be slightly broader than the ones at issue in the cases cited above, as there is no reference to a specific crime here and warrants here used language such as "including but not limited to," *see Zanche*, 541 F.Supp. at 212, the warrants did include a list of items sought which made it clear that the searchers were to direct their attention to documentation relating to the fake Dali prints: "... prints attributed to *Salvador Dali;* other works of art attributed to *Salvador Dali* ..." (emphasis added) Similarly, although the *Buck* warrant—which reads "any paper, things or property of any kind relating to [the] previously described crime"—referred to a specific crime, it gave no indication, as these warrants do, of any limitation on the scope of the search itself by referring to certain kinds or categories of evidence such as Dali artwork. Thus, for practical purposes, the warrants here are narrower than the warrant in *Buck* which the Second Circuit found not so broad as to preclude good faith reliance. Read in a "commonsense" fashion, *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), I find that the warrants, while perhaps too broad to meet the Second Circuit's particularity requirement, are not so broad as to amount to a general warrant in the Second Circuit [8] such that no officer could rely on them in good faith.

Second, it violates Supreme Court precedent to assume, as defendants implicitly do, that a warrant may be found too broad for good faith reliance by referring solely to the face of the warrant, without considering other circumstances. As the Supreme Court stated in *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421, whether a warrant is so facially deficient that the executing officers cannot reasonably presume it valid "depend[s] on the *circumstances* of the particular case." (emphasis added) *See e.g., Massachusetts v. Sheppard, supra.* Here, as I have stated, the circumstances surrounding these searches support a finding of good faith. Although the affidavits were not physically attached to the warrants here, and might not simply because of such attachment be read to limit the breadth of the warrants so as to cure the failure of the warrants to particularize the things to be seized, *Center Art Galleries*, at 749, the affidavits were read by all the agents conducting the search. Moreover, the affiants themselves participated in the searches, ensuring that the affidavits in fact limited the breadth of the warrants. Indeed, defendants have not challenged the actual extent of the searches in their voluminous papers, which suggests strongly that the officers did act in good faith in relying on these warrants, and considered themselves limited to the subject matter of the affidavits—Dali prints.

Third, my reading of Ninth Circuit case law on this subject convinces me that the Ninth Circuit cases which *Center Art Galleries* relied on to reject good faith take a much narrower view than does the Second Circuit of how *Sheppard* applies to cases where agents rely on a facially overbroad warrant. Former Chief Judge Lumbard, writing for the Second Circuit in *Buck*, 813 F.2d at 592 & n. 1, interpreted *Sheppard* broadly to establish the proposition that suppression is inappropriate even where a warrant is facially invalid if the circumstances of the search demonstrate that the officers "made considerable efforts to comply with the dictates of the Fourth Amendment." In *Buck*, the officers had sought out a neutral magistrate, outlined the crime and described the evidence to him. In those circumstances, the *Buck* court found that a warrant that permitted the seizure of "any papers, things or property of any

---

**8.** Given that the determination should be based on existing case law within the circuit where the search is conducted, I find inapposite cases defendants and the government cite from other circuits.

kind relating to [the] previously described crime" was not so facially deficient as to preclude application of the *Leon* good faith exception. *See also United States v. Roberts*, 852 F.2d 671 (2d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988) (remanding to district court for determination whether good faith exception applies to overly broad warrant). In a footnote, Judge Lumbard noted that the Ninth Circuit in *United States v. Crozier*, 777 F.2d 1376, 1381–82 (9th Cir.1985), disagreed on this point, while the Eleventh Circuit in *United States v. Accardo*, 749 F.2d 1477, 1480–1481 (11th Cir.), *cert. denied,* 474 U.S. 949, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985), concurred in the Second Circuit's view. As explained by then-Judge Kennedy in *United States v. Spilotro*, 800 F.2d 959, 968 (9th Cir.1986), the Ninth Circuit's *Crozier* line of cases limits the applicability of *Sheppard* to situations where the magistrate makes "specific assurances … that the [officers'] overbreadth concern was without merit." Absent such assurances from a magistrate, *Crozier* and its progeny will not apply *Sheppard* to find good faith. Following the *Crozier* line of cases, the *Center Art Galleries* panel refused to find good faith reliance even though the postal agent there had modeled the warrants after the warrants here, consulted with agent DeMuro about the wording of the affidavit, submitted the warrants to both a United States Attorney and an Assistant United States Attorney for approval, and received also the approval of a magistrate. At 752.

A contrary line of Ninth Circuit precedent has applied *Sheppard* even though officers did not rely on specific assurances from a magistrate. *United States v. Luk*, 859 F.2d 667, 677 (9th Cir.1988); *Michaelian*, 803 F.2d at 1046–47; *United States v. Washington*, 797 F.2d 1461 (9th Cir.1986). These cases are more in line with *Buck*'s expansive reading of *Sheppard.* However,

these cases were distinguished by the *Center Art Galleries* panel, at 752–53 & n. 2, as involving searches where there was no evidence the affiant knew the warrant was overbroad. In *Center Art Galleries*, the district court found that the agent "was keenly aware that he was riding the outer limits of the Fourth Amendment." At 753 n. 2. With all due respect to the *Center Art Galleries* appellate panel and district court, the Supreme Court in *Leon* specifically rejected the notion that the inquiry into whether agents acted in good faith should delve into the agents' subjective belief of whether their actions were proper. Rather, the standard is an objective one.[9]

It is thus quite clear that the *Center Arts Galleries* panel's view of the applicability of *Sheppard* is much narrower than the Second Circuit's view enunciated in *Buck*, and thus that the *Center Arts Galleries* decision should not be used to decide the issues here. As a fallback position, defendants argue that *Buck* must be limited to the exigent circumstances involved there. In *Buck*, the officers were required to seek a warrant on an oral application in the middle of the night. Yet there is no indication in *Buck* that its holding was so limited. Indeed, the Court cited as support for applying the good faith exception an Eleventh Circuit case, *Accardo, supra*, which notably did not involve any exigent circumstances. *Buck*, 813 F.2d at 592 n. 1. Rather, I read *Buck* and *Sheppard* to stand for the proposition that the determination whether a warrant is so deficient that no officer could rely on it in good faith must be based on all the circumstances of the search, the wording of the warrant itself, and the state of circuit law at the time the warrant was executed.

In this inquiry I find instructive the Ninth Circuit opinion in *Luk*. 859 F.2d at 667. There, as here, the affidavit con-

---

9. The district court found also that the Hawaiian postal agent's knowledge that he was riding the outer limits of the Fourth Amendment derived from conversations with the agent involved here, Robert DeMuro. *In re Motion for Return of Property Pursuant to Rule 41*, 681 F.Supp. 677, 686 (D.Haw.1988). For the same reasons as above, to the extent that this finding implies that DeMuro knew that the searches he was involved in also were suspect, I will not consider it.

tained significant limitations which would have cured the breadth of the warrant. Here, the affidavit clearly signalled that the search was to be limited to Dali-related sales and fake Dali artwork. However, as in the case at hand, the affidavit in *Luk* was not expressly incorporated into the warrant by reference, precluding the possibility that the affidavit could cure the particularity problem under controlling Ninth Circuit case law.[10] Nevertheless, as here, the affiant was present at the searches; the searching agents were given copies of the affidavit; and the officers seized only items relating to activities described in the affidavit. 859 F.2d at 677. Based on these circumstances, the court found that an otherwise overly broad warrant could be relied on in good faith. I find *Luk* a persuasive parallel to the situation at hand.

To reiterate, even conceding that the warrants were overbroad, the other circumstances of the search—the presence of the affiants at the searches, the fact that all searching agents were given copies of the limiting affidavits, and the fact that the search did not extend beyond the limitations set out in the affidavits—demonstrate that the agents relied on the warrant in good faith. Thus, I find that the good faith exception applies to these search warrants. Accordingly, defendants' motion to suppress evidence is denied.

SO ORDERED.

---

**10.** I note, as the *Luk* panel observed, 859 F.2d at 676 n. 8, that other circuits have not applied the requirement that the affidavit be incorporated by explicit reference or physically attached to the warrant in a rigid fashion. *See Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir.1987); *United States v. Wuagneux*, 683 F.2d 1343, 1351 n. 6 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).