UNITED STATES of America, Plaintiff,

v.

John S. NAJARIAN, Defendant.

Crim. No. 3–95–45(1).

United States District Court,
D. Minnesota,
Third Division.

Dec. 18, 1995.

Peter Thompson and John W. Lundquist, Thompson, Lundquist & Sicoli, Minneapolis, MN, for defendant.

Henry J. Shea, Mark D. Larsen, and Janet A. Newberg, Assistant United States Attorneys, Minneapolis, MN, for U.S.

## ORDER

KYLE, District Judge.

This matter is before the Court on (1) Defendant's Objections to the November 24, 1995 Report and Recommendation ("R & R") of United States Magistrate Judge Raymond L. Erickson, (2) Defendant's Appeal from the November 24 Order ("November 24 Order") of Magistrate Judge Erickson, and (3) Defendant's Appeal from the December 1, 1995 Order ("December 1 Order") of Magistrate Judge Erickson. In the R & R, Magistrate Judge Erickson recommends Defendant's Motion to Suppress be denied; in the November 24 Order, Magistrate Judge Erickson denied Defendant's Motion for the Conduct of a *Franks* Hearing; and in the December 1 Order, Magistrate Judge Erickson denied Defendant's Motion to Compel production of Item 1B385.[1]

The Court reviews a magistrate judge's report and recommendation de novo and reviews a magistrate judge's order under the clearly erroneous standard. 28 U.S.C. §§ 636(b)(1)(C) and 636(b)(1)(A); *Banbury v. Omnitrition Int'l, Inc.,* 818 F.Supp. 276, 279 (D.Minn.1993).

In his Objections to and Appeal from the November 24 Order and R & R, Defendant claims the Magistrate Judge erroneously concluded (1) Defendant lacks standing to challenge the search of the home of James Coggins; (2) the search warrant was supported by adequate probable cause; (3) the defense is not entitled to a *Franks* hearing; and (4) the search warrant was not over-

broad and, alternatively, is saved by the "good faith" exception.

The Court has carefully reviewed the Defendant's Objections, Appeals, and supporting memoranda. The November 24 Order and R & R is thorough and well-reasoned. The Court concurs with the Magistrate Judge's conclusions and rationale; it will accordingly adopt the R & R and affirm the Order. The Court need not resolve Defendant's Appeal from the December 1 Order. Subsequent to the Defendant's Appeal from that Order, the Government notified the Court it has produced Item 1B385; Defendant's Appeal from that Order is therefore moot.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

(1) The Court will **ADOPT** the November 24, 1995 Report and Recommendation (Doc. No. 162) of Magistrate Judge Erickson and Defendant's Motion to Suppress (Doc. No. 65) is accordingly **DENIED**;

(2) The November 24, 1995 Order (Doc. No. 162) of Magistrate Judge Erickson is **AFFIRMED**; and

(3) The Defendant's Appeal from the December 1, 1995 Order of Magistrate Judge Erickson (Doc. No. 166) is **DENIED AS MOOT.**

## ORDER and REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 24th day of November, 1995.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon the Defendant's Motion for a *Franks* Hearing, and upon his Motion to Suppress evidence that was seized during the execution of two Search War-

---

1. Item 1B385 is described as "a collection of papers relating to an opinion letter that was prepared, at the University's request, by attorneys at the Oppenheimer Wolff & Donnelly Law Firm concerning the exposure of the University's Department of Surgery to taxation on 'unrelated business taxable income.'" (December 1 Order at 2.)

rants.[1] See, *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

A Hearing on the Motions was conducted on November 9, 1995, at which time the Defendant appeared personally and by Peter Thompson and John W. Lundquist, Esqs., and the Government appeared by Henry J. Shea, Mark D. Larsen, and Janet A. Newberg, Assistant United States Attorneys.

For reasons which follow, we deny the request for a *Franks* Hearing, and we recommend that the Motion to Suppress be denied.

## II. *Findings of Fact* [2]

Upon the Application and Affidavit of James Molnar ("Molnar"), a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS"), two Search Warrants were issued by United States Magistrate Judge Jonathan G. Lebedoff, on September 29, 1995. One of the Warrants authorized a search at 4157 Rahn Road, Eagan, Minnesota, which was the residence of James E. Coggins ("Coggins"), who then served as the Administrative Director of the University of Minnesota Department of Surgery and as the Chief Financial Officer of the Department of Surgery Associates ("DSA"), a partnership that operates a private medical practice within the University of Minnesota Medical School. The second Warrant authorized a search of the offices of DSA, of Coggins, and of Coggins' Secretary, which were located, respectively, in Rooms 11–118, 11–116, and 11–114 of the Phillips Wangensteen Building, at 516 Delaware Street, S.E., in Minneapolis, Minnesota. According to the averments of Molnar's Affida-

vit, Coggins performed DSA-related business at his personal residence and, therefore, there was reason to believe that DSA's records could be found at that location.

Molnar's Affidavit, which was 29 pages in length, also attested to his 26 years of experience in investigating violations of the Federal tax laws, and reported on his investigation of the financial affairs of DSA. According to Molnar, the partners in DSA were employed as instructors on the faculty of the Department of Surgery at the University of Minnesota ("University"), and they earned their income from both DSA, in their capacities as private practitioners, and from the University, as members of the teaching staff. Having reviewed certain of the University's financial records, which had been produced pursuant to a Grand Jury Subpoena, Molnar related a series of transactions which he regarded as irregular. For instance, Molnar made the following observation with respect to the confidentiality that attended DSA's financial affairs:

> Based upon my experience in investigating financial crimes over the past 23 years, I believe that although confidentiality of financial matters is necessary to a certain extent, the secrecy with which DSA dealt with both Bernie Ley [the Administrative Director of the Department of Surgery] and the Legislative Auditors [of the State of Minnesota] is an indication of more than just a concern over confidential financial information. Furthermore, neither the University nor the auditors can conduct any type of financial inquiry without such information. The complete control of fi-

1. A number of other Motions were addressed at the Hearing of November 8 and 9, 1995, including Motions to Suppress certain of the Defendant's statements, and to Dismiss various Counts of his Indictment. We separately address the issues attendant to the execution of the Search Warrants since, at the Hearing of November 9, we took under advisement the Defendant's request to elicit the testimony of the Agent who had applied for those Warrants. The briefing is completed on this limited issue, and no reason appears to postpone our ruling while we await the parties' submissions on the other pending matters.

2. Rule 12(e), Federal Rules of Criminal Procedure, provides that, "[w]here factual issues are

involved in determining a motion, the court shall state its essential factual findings on the record." As augmented by our recitation of factual findings in the course of our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. *United States v. Moore*, 936 F.2d 287, 288–89 (6th Cir.1991), cert. denied, 505 U.S. 1228, 112 S.Ct. 3052, 120 L.Ed.2d 918 (1992); *United States v. Prieto–Villa*, 910 F.2d 601, 610 (9th Cir.1990).

nancial information by an entity such as DSA allowed DSA total unrestricted use of the private practice income since no accounting of this money was apparently made to anyone. In addition, the commingling of private practice monies with other monies such as gifts or grant funds and the inconsistent use of accounting codes in moving this money from DSA to the University appear to be additional attempts to conceal the true source and identity of the monies.

Based upon his investigation, Molnar concluded that "the only persons in the financial know at DSA were Coggins and the managing partner and Director of the Department of Surgery, John Najarian." Molnar opined that, based upon his past experience, "the likelihood of the commission of financial crimes increases where secrecy shrouds financial affairs, discreet revenue sources are commingled and many different accounting codes are used to reflect similar or identical transactions."

Although a "private practice monitor" reviewed the compensation received by the partners of DSA, both from DSA and from the University, Molnar and the Legislative Auditor believed that the Monitor rarely examined supporting documentation in overseeing DSA's financial affairs. Molnar's Affidavit then recounted certain accounting practices which he grouped under the heading of "False Business Expenses." Included among these practices were the retroactive payment of income by DSA to Dr. Stuart Jamieson ("Jamieson"), the former head of the University's Cardiothoracic Surgery unit; a series of low interest loans to DSA's partners; the deferral of payments to the University, following the close of DSA's tax year; and purported irregularities in DSA's balance sheet entries and in its tax returns. Based upon his past experience, and the results of his investigation, Molnar expressed the following views:

I * * * believe that there is probable cause to believe that these records [as identified in an attachment to Molnar's Affidavit] will constitute evidence that DSA filed false tax returns during the years 1988 through 1991 in violation of

Title 26, United States Code Sections 7206(1) and 7206(2) and committed violations of Title 18, United States Code Section 371, the conspiracy statute. In addition, I believe that these records will also show a violation of Title 18, United States Code Section 666 as its relates to substantial amounts of interest income lost annually by the University of Minnesota, a federally funded entity.

As noted, Magistrate Judge Lebedoff issued Warrants for the seizure of some 21 categories of DSA's records, in addition to its computer equipment. Following their issuance, the Search Warrants were executed and DSA documents, including papers belonging to the Defendant, were seized.

On June 1, 1995, the Defendant filed a Motion to Suppress the evidence that was seized during the execution of the two Search Warrants. In support of his Motion, the Defendant contends that Molnar's recitation of the facts, which surrounded DSA's payment to Jamieson of $531,308.00, were false or were recklessly made; that the Affidavit of Molnar did not support a finding of probable cause for the issuance of a Search Warrant; and, that the Warrants issued upon that Affidavit were overbroad and lacked specificity as to the items to be seized.

With respect to Jamieson, Molnar's Affidavit relates that, in June of 1993, he interviewed Jamieson concerning DSA. Jamieson advised that he had been hired by the University in 1986, and that he was compelled by Coggins to join DSA, which would administer the billings from Jamieson's private practice. By virtue of his membership in DSA, Jamieson was obligated to make payments to DSA, from his private practice billings, but he was not comfortable in doing so, because "the money going into DSA was like money going into a black hole." Nevertheless, at the start of his relationship with DSA, Jamieson was making payments to that partnership in a monthly amount of $150,000.

In April of 1988, Jamieson told the Defendant that he would be withholding his monthly payments to DSA until such time as DSA furnished him with an accounting of those funds. Later, in August of 1988, an article appeared in the *Minneapolis Star and Trib-*

*une,* which was attributed to "unnamed sources" and which accused Jamieson of medical misconduct. Although the article was short-lived—having been retracted on the day following its publication—Jamieson was terminated from the University, and all of his ties with the University were severed in the early part of 1989. In order to uncover the identities of those responsible for the disparaging newspaper article, Jamieson commenced a lawsuit entitled "Stuart Jamieson vs. John Doe and Mary Roe." According to Molnar's Affidavit:

> When Jamieson's attorney attempted to take depositions from Coggins, doctors in the Department of Surgery (such as Dr. Foker)[3] and Robert Dickler, the hospital administrator, a settlement was reached in the lawsuit. As part of the settlement, Jamieson received a little over one half million dollars from DSA even though DSA was not a named defendant in the lawsuit.

Molnar's Affidavit goes on to state:

> In early 1991, Jamieson received a Schedule K-1, Partner's share of income, credits, deductions etc. for the calendar year 1990 showing that he had received $531,308 as ordinary income from trade or business activity from DSA. Jamieson had not been a partner in DSA since sometime in 1989. When Jamieson's attorney called Coggins to inquire about the K-1, Coggins allegedly said, "You've got the K-1, you deal with it." This money, in fact, represented the settlement of the lawsuit, not Jamieson's income from the partnership. Amounts paid in settlement of tort suits are not deductible as business expenses. Salary is. By classifying the settlement as salary DSA could take a tax deduction for something that was clearly not tax deductible.

Molnar has further averred that "Jamieson said he received the half million dollar settlement from DSA and yet, none of the other partners in DSA knew about it."

In contrast, the Defendant contends that Molnar erred in characterizing the proceeds received by Jamieson as a settlement of his civil claim. According to the Defendant, the IRS has commenced a civil audit, which relates to Jamieson's receipt of the half-million dollars, in order to determine if Jamieson should have reported those funds as income subject to taxation. As additional support for his contention, that Molnar was guilty of a mischaracterization, the Defendant called DSA's attorney, John G. Hoeschler ("Hoeschler"), to testify at the Suppression Hearing. In Hoeschler's view, DSA was concerned that Jamieson had not been properly reporting his income from his private practice to DSA and that, in order to assure that the respective accounts of DSA and Jamieson were properly credited, DSA issued two checks to Jamieson—on the same date in July of 1990—one in the amount of $132,606.46, and the other for $398,601.82. Both checks were made payable to Jamieson's attorneys, and each bore the legend: "Final Salary Compensation Dr. Stuart W. Jamieson." Although Hoeschler denied that these payments were in exchange for a dismissal of the Jamieson's lawsuit, he acknowledged that the payments were made after Jamieson's lawsuit was commenced, and after attempts were made to secure Coggins' deposition. He also allowed that Jamieson and DSA exchanged releases of an "omnibus" sort, but copies of the parties' settlement were not introduced as evidence.

In turn, the Government denies any misrepresentation on Molnar's part and relies upon the averments of Paul J. Walsh ("Walsh"), who is another Special Agent with the Criminal Investigation Division of the IRS. According to Walsh, based upon his referral, the IRS commenced a civil audit, in September of 1994—nearly one full year after the execution of the Warrants at issue—of Jamieson's receipt of the "$531,000 payment" from DSA. At the conclusion of that audit, Jamieson received a letter from the IRS, dated August 16, 1995, advising him that the IRS "made no changes to the tax" that Jamieson had reported on his 1990 tax return. Therefore, the Government argues:

---

**3.** Insofar as we have been able to determine, "Dr. Foker" has not been identified in the Record before us.

Based upon the information available to him at the time, former SA Molnar was correct to question DSA's characterization of the payment. It is reasonable to conclude that there is nothing even incorrect, much less false, in Molnar's statements in his affidavit that "this money, in fact, represented the settlement of the lawsuit", that "settlement[s] of tort suits are not deductible as business expenses" and that "by classifying the settlement as salary DSA could take a tax deduction for something that was clearly not tax deductible."

Nevertheless, the Defendant contends that a sufficient showing has been made to warrant the conduct of a *Franks* Hearing and, at the Suppression Hearing, the Defendant sought to call Molnar to testify. Given the showings made at that time, and the Court's interest in a thoughtful review of the parties' respective submissions, the Court took the Motion for a *Franks* Hearing under advisement.

As a further, fact-laden basis to preclude the conduct of a *Franks* Hearing, the Government challenges the "standing" of the Defendant to contest the execution of the Search Warrants, since the premises being searched were not personal to him, but were either the business offices of DSA, Coggins and Coggins' Secretary, or the personal residence of Coggins, as to which the Defendant had no reasonable expectation of privacy. On this issue, Molnar's Affidavit advises that DSA's offices are located within the University's Department of Surgery, and comprise a large, open work area "surrounded with offices located at its perimeter," including that of Coggins, and a separate office for Coggins' secretary. On the basis of testimony presented to the Grand Jury, Coggins was reputed to have spent from 15 to 25 percent of his time on DSA concerns, and the remainder of his time on University business.

The Defendant takes issue with the asserted lack of "standing" and, on the first day of the Suppression Hearing, the Defendant submitted his Affidavit which, for the first time, addressed those factors which he regarded as impacting upon his legal capacity to contest the searches that were completed pursuant to the Warrants. Among other matters, his Affidavit attests to the following:

The records of DSA, which were maintained in rooms 11–114, 11–116 and 11–118 of the Phillips–Wangensteen Building, were maintained in strict confidence. As indicated, the University did not have access to DSA files and those offices were kept under lock and key. Those having keys were Mr. James Coggins, the DSA Administrator, Mr. Coggins' secretary, the building janitor and myself. I was the Managing Partner of DSA and also Chairman of the Department of Surgery. The records which were seized include the files of my private practice and include confidential records concerning the compensation received by each partner together with other information regarding taxes, patient billing and correspondence. I had a very strong expectation of privacy in these materials. * * * The papers seized were, to a significant extent, my papers and I exercised possessory control over them by virtue of having a key to those offices as well as being the Managing Partner.

As to the records seized at Coggins' personal residence, the Defendant avers as follows:

The DSA files taken from [Coggins'] home are the same types of records that were maintained in the Phillips–Wangensteen Building. I fully expected these records to be maintained in confidence. As Managing Partner of DSA and as the owner of many of these records, I ultimately had control over the documents.

Although disputing the conclusory tone of the allegations, and the ultimate conclusion that the Defendant draws from his averments, the Government does not seriously contest the strict secrecy which shrouded the records of DSA.

### III. *Discussion*

Four issues are presented by the Defendant's Motion to Suppress the evidence obtained through the search of DSA's records:

1. Does the Defendant have standing to challenge the legality of the Search Warrants?

2. Do the allegations of Molnar's Affidavit provide probable cause for the issuance of the Search Warrants?

3. Does Molnar's Affidavit, upon which the Search Warrants were issued, contain errors or omissions of fact which warrant the conduct of a *Franks* Hearing?

4. Was the Search Warrant impermissibly overbroad in particularizing the evidence that was subject to seizure?

We address the threshold issue of "standing" first.[4]

A. *Does the Defendant Have Standing to Challenge the Legality of the Search Warrants?*

■ 1. *Standard of Review.* "The Fourth Amendment to the United States Constitution provides that the Federal Government shall not violate '[t]he right of the people' to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Vernonia School Dist. 47J v. Acton,* ⸺ U.S. ⸺, ⸺, 115 S.Ct. 2386, 2390, 132 L.Ed.2d 564 (1995). "It has long been the rule," however, "that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla,* 508 U.S. 77, 81, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993) [Emphasis in original]. This is so "[b]ecause Fourth Amendment rights are personal and may not be asserted vicariously." *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir.1994), citing *Rakas v. Illinois,* 439 U.S. 128, 138–44, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1978), and *United States v. Morales,* 737 F.2d 761, 763 (8th Cir.1984); see also, *United States v. Monie,* 907 F.2d 793, 794 (8th Cir.1990).

■ As a consequence, "[t]he defendant moving to suppress bears the burden of prov-

ing he had a legitimate expectation of privacy that was violated by the challenged search." *United States v. Muhammad,* 58 F.3d 353, 355 (8th Cir.1995), citing *United States v. Kiser,* 948 F.2d 418, 423 (8th Cir.1991), cert. denied, 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992). In bearing that burden, a two-part inquiry is presented: 1) whether the defendant has asserted a subjective expectation of privacy, which is a question of fact; and 2) whether the defendant's subjective expectation is objectively reasonable, which raises a question of law. *United States v. Welliver,* 976 F.2d 1148, 1151 (8th Cir.1992), cert. denied, ⸺ U.S. ⸺, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993); see also, *United States v. Dickson,* 58 F.3d 1258, 1264 (8th Cir.1995). "Factors relevant to the determination of standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *United States v. Gomez,* supra at 256, citing *United States v. Sanchez,* 943 F.2d 110, 113 (1st Cir.1991); see also, *United States v. Stallings,* 28 F.3d 58, 61 (8th Cir.1994). In sum, "[i]f a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized." *United States v. Gomez,* supra at 256; see also, *United States v. Muhammad,* supra at 355.

■ 2. *Legal Analysis.* We think it appropriate to address the Defendant's standing to challenge these Warrants with the focus of our inquiry being guided by the

---

4. In *Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), the Supreme Court expressed a preference for focusing "on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." While we employ the analysis dictated by *Rakas,* for the sake of convenience we follow the parties' lead in applying the label of "standing" to what is, at its core, a substantive question of Fourth Amendment law. See, e.g., *United States v. Dickson,* 58 F.3d 1258,

1265 (8th Cir.1995); *United States v. Macklin,* 902 F.2d 1320, 1331 n. 12 (8th Cir.1990), cert. denied sub nom. *Woods v. United States,* 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); *United States v. Mancini,* 8 F.3d 104, 105 n. 1 (1st Cir.1993); *United States v. Taketa,* 923 F.2d 665, 669 (9th Cir.1991); *United States v. Chuang,* 897 F.2d 646, 649 (2nd Cir.1990), cert. denied, 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990); *United States v. Leary,* 846 F.2d 592, 595 (10th Cir.1988).

character of the premises being searched. Of the search sites, we find little in the Record to substantiate the Defendant's assertion that he held "a very strong expectation of privacy" in the materials of DSA which were discovered in Coggins' personal residence. While we acknowledge that the Defendant had a possessory interest in some portion of the DSA records that the search uncovered, the ownership of the items seized is but one factor to be considered in the Fourth Amendment inquiry.[5] The Defendant makes no showing that he was able to control access to Coggins' premises, or that he, himself, had an unencumbered access to those premises.

Moreover, the Defendant has not asserted, let alone demonstrated, that he had a key to Coggins' home; that he either resided or worked in that home with regularity; that he had stored any of his personal effects there, apart from certain of his business papers;[6] or that he had attempted, in any appreciable way, to restrict others from accessing the DSA documents that were located at Coggins' residence. See, e.g., *United States v. Wiley*, 847 F.2d 480, 481 (8th Cir.1988) (absence of evidence that defendant had key to

third party's premises, had permission to enter in the owner's absence, had furniture, luggage or personal effects stored there, or had received his mail at that address, militated in favor of a finding of no legitimate expectation of privacy); *United States v. Nabors*, 761 F.2d 465, 468–70 (8th Cir.1985), cert. denied, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985) (same); *United States v. Reyes*, 908 F.2d 281, 285 n. 11 (8th Cir.1990), cert. denied, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). Nor can there be any serious contention that, as an alleged coconspirator of Coggins, the privacy interests of Coggins would extend to the Defendant. *United States v. Padilla*, supra 508 U.S. at 81, 113 S.Ct. at 1939; *United States v. Kiser*, supra at 424; *United States v. Jones*, 16 F.3d 275, 279 (8th Cir.1994). As a consequence, with respect to the Warrant for the search of Coggins' home, the Defendant has not articulated, much less established, any cogent basis for an actual, subjective expectation of privacy in those premises and, accordingly, we find that he is without legal standing to challenge the execution of that Warrant.[7]

---

5. Although not cited by either party, to the extent that *DePugh v. Penning*, 888 F.Supp. 959, 977 (N.D.Iowa 1995), may be read as premising the standing to contest a seizure, pursuant to a Warrant, solely upon a property interest in the materials seized, notwithstanding the absence of any privacy interest in the premises being searched, we are not so persuaded. In our view, such a proposition resurrects the "arcane distinctions developed in property * * * law," which the Supreme Court laid to rest in *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and in *Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980) ("While petitioner's ownership of the drugs is undoubtedly one fact to be considered in this case, Rakas emphatically rejected the notion that 'arcane' concepts of property law out to control the ability to claim the protections of the Fourth Amendment."). See, *Rakas v. Illinois*, supra 439 U.S. at 143, 99 S.Ct. at 430; see also, *United States v. Kimball*, 25 F.3d 1, 9 (1st Cir.1994) ("Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy[;] [o]wnership is relevant to the inquiry * * * but the total circumstances determine whether the one challenging the search has a reasonable and legitimate expectation of privacy in the locus of the search."). Consequently, we consider the Defendant's possessory interest in the items seized as a part of

our analysis, but that one factor is not solely determinative of the issue before us.

6. Notably, the Defendant does not attempt to vicariously invoke a physician-patient privilege on behalf of any of his patients, and there is no evidence before us that, in fact, such a privilege could be properly asserted as to the documents in question. Cf., *In re Search Warrant (Sealed)*, 810 F.2d 67, 70–72 (3rd Cir.1987), cert. denied sub nom. *Rochman v. United States*, 483 U.S. 1007, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987).

7. Since, with respect to the search of Coggins' home, we have resolved the standing issue "on the first level of inquiry, we need not reach the second." *United States v. Stallings*, 28 F.3d 58, 61 (8th Cir.1994), quoting *United States v. Monie*, 907 F.2d 793, 794 (8th Cir.1990). Nevertheless, we would observe that the Defendant allowed the DSA papers to be removed to a personal residence over which he had no possessory interest or, for that matter, any demonstrated means of restricting the access of interlopers. As our Court of Appeals has noted, "even the 'theoretical possibility' that 'animals, children, scavengers, snoops, and other members of the public' would happen onto an item [is] sufficient to make a defendant's expectation of privacy unreasonable." *United States v. Stallings*, supra at 61,

■ With respect to the Warrant for the search of Rooms 11–114, 11–116, and 11–118, we would, ordinarily, attempt to further dichotomize our analysis so as to account for the perceptually different principles which may distinguish the personal offices of Coggins, and those of his Secretary, from the general work area contained in Room 11–114. We find, however, that the evidence is insufficient to permit such a site-specific inquiry.[8] On the one hand, the Defendant paints with a broad brush and asserts that each of the rooms to be searched was a repository for DSA materials and, since the Defendant was the Managing Partner of DSA and owned a key to those premises,[9] he held a reasonable and legitimate privacy interest in the premises, and in the documents that were there stored. In response, the Government contends that these rooms did not function as the Defendant's personal offices and, relying upon the Court's reasoning in *United States v. Chuang*, 897 F.2d 646 (2nd Cir.1990), cert. denied, 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990), the Government urges that the Defendant's involvement in the affairs, which routinely transpired within these offices, was too attenuated and remote to imbue him with a legitimate, cognizable privacy interest. See, *Id.* at 649 (one challenging a search of business premises "must demonstrate a sufficient 'nexus between the

area searched and [his own] work space.' "), citing *United States v. Britt*, 508 F.2d 1052, 1056 (5th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975). Notwithstanding their other disagreements, all concede that the offices in question were not the Defendant's personal quarters.

Of course, whether an employee has a reasonable expectation of privacy in a work area, "must be addressed on a case-by-case basis." *O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987). As the Court noted in *Ortega:*

> The employee's expectation of privacy must be assessed in the context of the employment relation. An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work-related visits. Simply put, it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office. We agree with Justice Scalia that "[c]onstitutional protection against unreasonable searches by the government does not disappear merely be-

---

quoting *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1242 (8th Cir.1990). Accordingly, under the totality of the circumstances that have been presented here, we do not believe that society would be prepared to accept the Defendant's expectation of privacy at Coggins' residence as objectively reasonable. See, *California v. Greenwood*, 486 U.S. 35, 40, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988).

8. We remind the parties—and particularly the Defendant, since he bears the burden on this issue—that our analysis is driven by evidence and not by hypothesis. Here, the Government's challenge to the Defendant's standing was first broached in mid-June and yet, some five months thereafter, the Defendant largely leaves us to forage through the scant showings of his Affidavit in search of a factual basis that would lend substance to his privacy expectations. Although we are fully empowered to draw reasonable inferences from the evidence presented, we are not at liberty to pinion our factual findings upon conclusory pronouncements, which have no predication in fact, or upon theoretical constructs. For its part, the Government's showings on this issue, which are solely limited to the

Affidavit of Molnar, run counter to the result it seeks.

9. During the cross-examination of Hoeschler, the Government adduced evidence that DSA's Partnership Agreement, which was dated December 9, 1968, vested the "Head of the Department of Surgery" with the functions of the "Managing Officer," and that, at the time that these Search Warrants were executed, the Defendant had not served as the Head of the Department of Surgery for several months. Nevertheless, Molnar's Affidavit credits the Defendant as being the "managing partner of DSA," notwithstanding Molnar's express recognition that the Defendant was "[t]he chair of the Department of Surgery until the Spring of 1993." Given the dated nature of the Partnership Agreement, upon which the Government relies, we decline to find that the Defendant's historic role, as the manager of DSA, had diminished at the time that the searches ensued particularly when countered by the averments of Molnar which were *contemporaneous* with the warranted searches.

cause the government has the right to make reasonable intrusions in its capacity as employer," * * * but some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable.

*Id.* at 717–18, 107 S.Ct. at 1497–98.

Here, however, the Defendant does not assert that certain restricted areas of Rooms 11–114, 11–116 and 11–118 were exclusively used by DSA—such as specific filing cabinets—but, rather, he contends that his expectation of privacy extends throughout the expanse of these offices.

In addressing a privacy interest, as it has been so broadly framed by the Defendant, the Courts routinely look to whether the premises being searched have included the offices or work area of the party seeking to suppress. Although expressed in the context of a corporate enterprise, we think the Court, in *United States v. Hamdan,* 891 F.Supp. 88, 94–95 (E.D.N.Y.1995), has provided a useful explication of the governing law:

> Whether a corporate officer has standing to challenge the search of business premises depends upon whether the officer has made a "sufficient showing of a possessory or proprietary interest in the area searched," and whether the officer has demonstrated a sufficient nexus between the area searched and his own work place. * * * Generally, courts tend to find that these two elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office. * * * However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched. The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found. * * * By contrast, the less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found.

[Citations omitted].

Notwithstanding his burden to demonstrate an entitlement to challenge the search of the rooms in question, the Defendant has offered no evidence to establish that the rooms were dedicated to DSA work to the substantial exclusion of University-oriented activities; that DSA or the Defendant held any proprietary interest in these offices by virtue of any rental payments or by a sharing of the cleaning, maintenance, or utility expenses which were associated with their use; that the rooms were areas of restricted access, to which only authorized DSA personnel were admitted; or that the Defendant, with any regularity or frequency, occupied the premises in the course of his daily engagements.

We are mindful of the Defendant's uncontroverted assertion that he is only one of four persons who possesses a key to the offices in question, and we can accept, by that fact alone, that the Defendant has had a relatively unencumbered access to these rooms. Nevertheless, we are unable to conclude, on that fact alone, that his access was to the exclusion of others, or that he effectively controlled the accessibility of the spaces involved. We accept, of course, the Supreme Court's recognition that, within the workplace, employees may have a reasonable expectation of privacy against intrusions by the State, and those expectations are not diminished merely because the employer is a public agency. *O'Connor v. Ortega,* supra at 717, 107 S.Ct. at 1497; *Mancusi v. DeForte,* 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968). Here, however, the offices served a variety of purposes. Both Coggins and his secretary advanced the business interests of the University and, in that respect, their occupancy in University offices was consistent with the fact that the preponderance of their work, according to Molnar's Affidavit, was performed for the University. We can accept that some percentage of DSA work was also accomplished in the same space, but the limited number of keys to these premises permits no reasonable inference that DSA's private, business interests were not effectively engulfed by the University-directed work.

Absent some other showing by the Defendant, we would be persuaded that the Government's reliance upon *United States v. Judd,* 889 F.2d 1410, 1413 (5th Cir.1989), cert. denied sub nom. *Poodry v. United States,* 494 U.S. 1036, 110 S.Ct. 1494, 108

L.Ed.2d 629 (1990), was well-placed.[10] There, the President, Chief Operating Officer, and sole shareholder of a corporation, together with the corporation's Vice–President, sought to suppress evidence garnered through a warranted search of the corporation's bookkeeping office. Finding that the corporate officials "did not work out of that office," the Court denied them standing to object to the Search Warrant, even though the corporate President had prepared some of the records that had been seized. Cf., *United States v. Taketa*, 923 F.2d 665, 671 (9th Cir.1991) (casual user of office of another had no legitimate expectation of privacy in that office). Of course, since the determination of standing is, quite necessarily, fact-specific, we must look to any circumstance which would distinguish the reasoning in *Judd* from the issues presented here.

While the issue is a close one, we find that the evidence preponderates in favor of a finding that the Defendant had a reasonable and legitimate expectation of privacy as to those DSA records that were within DSA's offices. As synopsized by Molnar:

> Based upon my experience in the tax related investigations over the past 22 years, as well as the testimony of Bernie Ley, our witness interviews to date and the results of the State of Minnesota Legislative Auditor's attempts to obtain private practice financial records, I believe that any administrative efforts to obtain the records relative to the operation of [the] Department of Surgery Associates will be unsuccessful. This entity has demonstrated that most, if not all financial information, is kept exclusively between the Managing Partner, John Najarian and the Administrative Manager, James Coggins, and not even shared with other members of the partnership, the University of Minnesota, or anyone else. I believe that Coggins and Najarian know that by controlling these financial records, the nonreporting of assets on this balance sheet of the partnership, as well as any understatement of business receipts and/or overstatement or mis-classification of expenses as deductible items can go undetected.

This summarized view of the efforts the Defendant expended in shielding DSA records, even from the partners of DSA, is corroborated by the itemized showings in Molnar's Affidavit and, more importantly, is not contested by the Government. From the fact that the records of DSA, as contained in DSA's offices, were so effectively sealed from the purview of the University, the University's "private practice monitor," [11] the Legislative Auditors of the State of Minnesota, and from the partners of DSA themselves, we

---

10. In contrast, we find the cases, upon which the Defendant relies, to be inapposite. In *Henzel v. United States*, 296 F.2d 650, 651 (5th Cir.1961), *United States v. Lefkowitz*, 464 F.Supp. 227, 231 (C.D.Cal.1979), aff'd, 618 F.2d 1313, 1316 n. 2 (9th Cir.1980), and *United States v. Leary*, 846 F.2d 592, 596 (10th Cir.1988), the Search Warrants at issue were executed in the offices of the party moving to suppress the documents seized—a circumstance that is not presented here. With respect to *United States v. Burke*, 718 F.Supp. 1130, 1135 (S.D.N.Y.1989), it appears that the Court was persuaded that those moving for suppression were officers of the corporation being searched and that, because they were involved in the day-to-day operations of the corporation, they had standing to urge suppression. We are not persuaded that the managerial responsibilities of a business manager, without more, will satisfy the privacy expectations required for standing, nor do we read the cases upon which the Court there relied to support such a contention. See, *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (search of premises included office of movant to suppress); *United*

*States v. Schwimmer*, 692 F.Supp. 119, 125 (E.D.N.Y.1988) (same); *United States v. Leary*, 846 F.2d 592, 596 (10th Cir.1988) (same).

11. The Defendant has averred that the use of a "Monitor," who is under contract with the University to review certain of the financial records of private practice groups—such as DSA—"was devised to prevent private practice information from becoming public and part of the University system." Notwithstanding this averment, however, DSA's Partnership Agreement commits the "Managing Officer" of DSA to be "responsible" to the Dean of the University of Minnesota Medical School for: "(1) The maintenance of the partnership accounting records, (2) Billing for and collection of professional fees, (3) Paying of operating expenses, and (4) The maintenance of such records as may be necessary or advisable." Since the University appears to have acceded to the use of a "Monitor" to satisfy its supervisory role over the private practice groups, we think this further supports the Defendant's expectation that access to DSA's business records had been effectively circumscribed.

**1454**

draw the reasonable inference that the Defendant could legitimately expect that those records would remain secret, or nearly so.

Although not cited by either party, we think that the Court's decision in *United States v. Mancini*, 8 F.3d 104 (1st Cir.1993), provides guidance. There, the Court found that a Mayor had standing to contest the validity of a Search Warrant that had been executed to search the City's archive room and which, ultimately, uncovered the Mayor's personal calendar and the inculpatory evidence that the calendar contained. The Court concluded that the Mayor had secured the calendar in "the locked archive room, and [had] * * * instructed his Chief of Staff that 'no one was to have access to any of [his] boxes, including the box containing the calendars, without permission.'" *Id.* at 107 n. 6. Here, however, while there is no direct evidence that any such directives were given by the Defendant, so as to control the access of third-persons to the documents in question, we have no reason to believe that the sealing of the DSA records from public view could have been so historically effective without such a categorical insistence upon secrecy.[12]

Accordingly, as to the search of the offices in the Phillips Wangensteen Building, we find that the Defendant has demonstrated an actual expectation in the privacy of the records stored there which, in our view, is objectively reasonable. The Defendant took measures with respect to those documents, and had the means to effectuate the measures taken, which were not available to him in the residence owned by Coggins. According to Molnar's Affidavit, the Defendant historically, and peremptorily, controlled the business operations of DSA and effected a series of measures which effectively secured the records of DSA's operations from official and unofficial review.[13] Therefore, having determined that the Defendant had standing to challenge the searches at DSA's offices in the Phillips Wangensteen Building, our analysis of his Motion to Suppress continues.

**B.** *Do the Allegations of Molnar's Affidavit Provide Probable Cause for the Issuance of the Search Warrants?*

██ 1. *Standard of Review.* In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral and detached Judicial Officer will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Johnson,* 64 F.3d 1120, 1126 (8th Cir.1995). In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular, designated place. *United States v. Gladney,* 48 F.3d 309, 313 (8th Cir.1995); *United States v. Tagbering,* 985 F.2d 946, 949 (8th Cir.1993). Probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

██ The Application and Affidavits which support a request for a Search Warrant "should be examined under a common sense approach and not in a hypertechnical fashion." *United States v. Williams,* 10 F.3d 590, 593 (8th Cir.1993). In addition, the Court should review the affidavits as a whole, and not on a paragraph-by-paragraph basis.

12. The Government has argued that DSA was subject to such an intensity of public regulation that, necessarily, the Defendant's reasonable expectation of privacy had to have been reduced. See, e.g., *United States v. Leary,* supra at 596–98; *United States v. Chuang,* supra at 649–51. Notwithstanding the argument, we have no evidentiary basis to make such a finding here, and the Government has failed to draw our attention to any regulatory scheme, that would require the routine inspection of the documents at issue upon which the doctrine, that the Government seeks to deploy, is premised.

13. In this respect, we do not overlook the opinion of Molnar, who had extensive experience in investigating violations of the Federal tax laws, that the secrecy, which impermeably cloaked DSA's records, could not be pierced by "any administrative efforts," which we infer to include an Administrative Summons of the IRS.

*United States v. Anderson,* 933 F.2d 612, 614 (8th Cir.1991); *United States v. Townsley,* 843 F.2d 1070, 1076–77 (8th Cir.1988), cert. dismissed, 499 U.S. 944, 111 S.Ct. 1406, 113 L.Ed.2d 461 (1991). Moreover, the reviewing Court must not engage in a *de novo* review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. *United States v. Maxim,* 55 F.3d 394, 397 (8th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 265, 133 L.Ed.2d 188 (1995); *United States v. Curry,* 911 F.2d 72, 75 (8th Cir.1990), cert. denied, 498 U.S. 1094, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. *Illinois v. Gates,* supra at 236, 103 S.Ct. at 2331. Apart from the Defendant's contention that circumstances require the conduct of a *Franks* Hearing, we are not aware of any factor or circumstance which would properly detract from that standard of deferential review, and the parties do not draw any to our attention.

■ 2. *Legal Analysis.* Arguing that "[t]he assertions made in [Molnar's] Affidavit simply relate to debatable accounting practices or, at worst, improper accounting practices," the Defendant contends that Molnar's Affidavit fails to provide probable cause for the issuance of the Search Warrants. We disagree.

We think that the Defendant "wrongly assumes that circumstantial evidence ('innocent facts') alone cannot give a judicial officer probable cause to believe that evidence of criminal activity will likely be found in the place to be searched." *United States v. Edmiston,* 46 F.3d 786, 789 (8th Cir.1995); see also, *Illinois v. Gates,* supra at 244 n. 13, 103 S.Ct. at 2335 n. 14 ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); *United States v. Morales,* 923 F.2d 621, 625 (8th Cir.1991) ("[P]robable cause does not depend on the verification of illicit or even furtive activity; the 'corroboration of minor, innocent details can suffice to establish probable cause'"). For, "[i]f circumstantial evidence can be suf-

ficient to prove the elements of a crime beyond a reasonable doubt, * * * then a fortiori such evidence can be sufficient to establish probable cause for the issuance of a search warrant." *Id.* [Citation omitted]. Here, the totality of the circumstances, that were fully elaborated in Molnar's Affidavit, provided the Magistrate Judge with substantially more than a plausible basis to believe that mere accounting irregularities were not at hand, that violations of the Federal tax laws would be revealed in an inspection of DSA's business records, and that the officers of DSA, including the Defendant, were attempting to conceal those irregularities from discovery. Applying a practical, common sense reading to Molnar's Affidavit, we find an abundance of probable cause to believe that a search of DSA's records, both at the home of Coggins, and at DSA's offices in the Phillips Wangensteen Building, would uncover the evidence of a crime. Indeed, in our considered view, given the comprehensiveness of the Affidavit's factual recitations, a "prudent person" could not reach a contrary finding. Accordingly, we conclude that the Search Warrants were issued upon a compellingly cogent showing of probable cause.

C. *Does Molnar's Affidavit, Upon Which the Search Warrants Were Issued, Contain Errors or Omissions of Fact Which Warrant the Conduct of a Franks Hearing?*

■ 1. *Standard of Review.* To receive a *Franks* Hearing, a Defendant must make, by a preponderance of the evidence, a "substantial preliminary showing" of a deliberate falsehood or of a reckless disregard for the truth in the Affidavit upon which a Warrant was issued. *United States v. Clapp,* 46 F.3d 795, 798 (8th Cir.1995); *United States v. Keeper,* 977 F.2d 1238, 1242 (8th Cir.1992); *United States v. Wajda,* 810 F.2d 754, 759 (8th Cir.1987), cert. denied, 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). Mere allegations of negligence or innocent mistake are insufficient. *Franks v. Delaware,* supra 438 U.S. at 171, 98 S.Ct. at 2684; *United States v. Clapp,* supra at 798, citing *United States v. Parsons,* 585 F.2d 941, 942 (8th Cir.1978), cert. denied, 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979).

■ Moreover, the contested averments of the Affiant must be vital to the determination of probable cause. *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, —— U.S. ——, 116 S.Ct. 193, 133 L.Ed.2d 128 (1995); *United States v. Gladney*, supra at 314; *United States v. Williams*, 981 F.2d 1003, 1005 (8th Cir.1992). If, after disregarding the contested statements, there is still sufficient material in the Affidavit to support a finding of probable cause, no evidentiary Hearing is required. *United States v. Crook*, 936 F.2d 1012, 1014 (8th Cir.1991), cert. denied, 502 U.S. 1075, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992). As a consequence, the "substantiality" requirement is not easily met, since there is a presumption of validity with respect to an Affidavit which supports a Search Warrant. *United States v. Hiveley*, 61 F.3d 1358, 1360 (8th Cir.1995), citing *United States v. Wajda*, supra at 759; see also, *United States v. Crook*, supra at 1014.

■ Beyond precluding the admission of materials which were seized during the execution of a Warrant that was premised upon willfully false statements, *Franks* also excludes evidence that was seized on the basis of a Warrant which was founded upon deliberate or reckless omissions. *United States v. Clapp*, supra at 798, citing *United States v. Humphreys*, 982 F.2d 254, 258 n. 2 (8th Cir.1992), cert. denied, —— U.S. ——, 114 S.Ct. 61, 126 L.Ed.2d 31 (1993); see also, *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir.1986). In such a case, the Defendant must show "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, * * * and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *United States v. Lucht*, 18 F.3d 541, 546 (8th Cir. 1994), cert. denied, —— U.S. ——, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994), quoting *United States v. Reivich*, supra at 961; see also, *United States v. Falls*, 34 F.3d 674, 681 (8th Cir.1994).

■ 2. *Legal Analysis.* According to the Defendant, Molnar's characterization of DSA's payment to Jamieson, as the proceeds of a settlement, was a false statement that Molnar made either knowingly or intentionally, or with a reckless disregard for its truth. We disagree, for we have no means of ascertaining, on the Record before us, that the statement was inaccurate, much less that it constituted a deliberate falsehood.

As Molnar's Affidavit makes clear, he interviewed Jamieson in June of 1993 and, at that time, Jamieson "said he received the half million dollar settlement from DSA and yet, none of the other partners of DSA knew about it." Molnar's Affidavit plainly reflects that DSA regarded its payment to Jamieson as income, but when requested by Jamieson's attorneys to explain DSA's treatment of the funds as income, Coggins responded: "You've got the K–1, you deal with it." Of course, DSA's drafts to Jamieson are now a part of the Record, but they reflect the payee to be Jamieson's attorneys—not the usual or likely recipient of income payments that are owing to the attorney's client in unrelated claim, i.e., in an action in which no claim for past salary was being made. While the drafts contain the notation "Final Salary Compensation Dr. Stuart W. Jamieson," such a jotting is not a binding declaration upon either Jamieson or the IRS.

Moreover, we find Hoeschler's testimony, to the effect that, in his view, the drafts were not in settlement of Jamieson's lawsuit, to be anomalous. The facts before us reflect that, prior to the taking of Coggins' deposition, in a lawsuit in which neither DSA, Coggins or any associate of DSA was a named-Defendant, approximately one-half million dollars was paid by DSA to Jamieson with the lawsuit then being dismissed and with releases then being exchanged between Jamieson and DSA. As a consequence, we cannot say, on the basis of the Defendant's proof, that, by a preponderance of the evidence, he has shown that the recital of Jamieson's characterization of the proceeds as a settlement was in error. As the Court in *Franks* made indelibly clear:

> The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Franks v. Delaware*, supra at 171–72, 98 S.Ct. at 2684.

Although the Defendant may quarrel with Jamieson's characterization of the DSA proceeds, we find no basis for the Defendant to challenge Molnar's Affidavit on that ground.[14]

Moreover, even if an inaccuracy were found to have been presented to the issuing Magistrate Judge, the Defendant has failed to demonstrate that the inaccuracy was knowingly or recklessly made. In this respect, our Court of Appeals has recently addressed the proof that would be essential to a finding of deliberate falsehood, or to a determination of reckless disregard for the truth. In *United States v. Clapp*, supra at 800, the Court noted that the guidance, which the Supreme Court in *Franks* shed on this issue, was "limited" to the following:

When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks v. Delaware*, supra at 164–65, 98 S.Ct. at 2681 [Emphasis in original]. The Court then applied a test which was derived from those Circuits which "have explicitly adopted the First Amendment libel standard for determining whether a statement is made with reckless disregard for the truth." *United States v. Clapp*, supra at 800. In the words of the Court:

Applying the First Amendment standard to Fourth Amendment cases, these courts have looked to whether the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein."

*Id.*

Simply put, the Defendant has not satisfied this test, and we have no evidentiary basis to find that Molnar's statements, which are here attacked, were either willfully false, or recklessly made.

Lastly, even if we were to delete the assertions which the Defendant has isolated as objectionable, we still find that Molnar's Affidavit provides probable cause for the issuance of the Warrants in question. The characterization of DSA's half-million dollar payment to Jamieson was but one of a protracted series of accounting irregularities which would fairly prompt a prudent person into believing that a search of DSA's business files would, in all probability, produce evidence that a crime had been committed. See, *United States v. Ozar*, supra at 1446, citing *United States v. Lucht*, supra at 546; *United States v. Gladney*, supra at 314; *United States v. Clapp*, supra at 802.

---

**14.** We find equally unconvincing the Defendant's reliance upon an IRS audit of Jamieson's income tax returns well after the fact. Even if we thought that such hindsight could be enlightening—and we have no such misperception—here the audit confirmed that Jamieson properly treated the DSA proceeds as not being subject to taxation—a result that contradicts the Defendant's claim.

Similarly, we find no useful guidance in the Defendant's citation to either *CIR v. Heininger*, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943), or to *Cornelius Vanderbilt, Jr. v. Commissioner*, 16 TCM 1081, 1957 WL 840 (1957). Not infrequently, the parties to a settlement will characterize the nature of the transaction in a way that fosters an attempt, by one of the parties, to obtain favorable tax treatment. With equal frequency, the parties disagree as to the proper characterization. We seriously doubt that the Magistrate Judge, who issued the Warrants here, was duped into believing that either DSA's or Molnar's characterization was the correct one. The fact of the matter is that the circumstances related by Molnar were sufficient to raise a plausible concern that DSA's characterization was inaccurate and that DSA was attempting to conceal that inaccuracy even from its member partners. Of course, in our evaluation of the showings, which have been made in support of a Search Warrant, we must be ever mindful that the issuing Judicial Officer is to be "neutral and detached—not naive and ingenuous." *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1986). On this Record, the Defendant has made no showing that the neutral and detached Magistrate Judge was cozened into believing something that was not true.

Therefore, we deny the Defendant's Motion to convene a *Franks* Hearing, and we recommend that his Motion to Suppress on this ground also be denied.

D. *Was the Search Warrant Impermissibly Overbroad in Particularizing the Evidence that Was Subject to Seizure?*

■■ 1. *Standard of Review.* "The fourth amendment requires that a search warrant describe with sufficient particularity the things to be seized in order to prevent a 'general, exploratory rummaging' in a person's belongings." *United States v. Kail,* 804 F.2d 441, 445 (8th Cir.1986), quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971). Since the degree of specificity, that is required in applying the particularity requirement, is flexible and may vary depending on the circumstances and the types of items involved, we apply a "practical accuracy" rather than a "technical nicety" standard. *United States v. Wayne* 903 F.2d 1188, 1195 (8th Cir.1990), citing *United States v. Johnson,* 541 F.2d 1311, 1313 (8th Cir.1976); see also, *United States v. Lowe,* 50 F.3d 604, 607 (8th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 260, 133 L.Ed.2d 183 (1995); *United States v. Hibbard,* 963 F.2d 1100, 1102 (8th Cir.1992), citing *United States v. Pillow,* 842 F.2d 1001, 1004 (8th Cir.1988). As a result, "a search warrant involving a scheme to defraud is 'sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit.'" *United States v. Saunders,* 957 F.2d 1488, 1491

(8th Cir.1992), cert. denied, 506 U.S. 889, 113 S.Ct. 256, 121 L.Ed.2d 187 (1992), quoting *United States v. Kail,* supra at 445.

■ 2. *Legal Analysis.* Our resolution of the Defendant's overbreadth argument is closely guided by our Court of Appeals' decision in *United States v. Stelten,* 867 F.2d 446 (8th Cir.1989), cert. denied, 493 U.S. 828, 110 S.Ct. 95, 107 L.Ed.2d 59 (1989). There, the Court reviewed a Search Warrant, that was as encompassing in its reach as those presently before us, and concluded that the Warrant was "not facially overbroad because it called for the seizure of property being used in violation of federal law and because the seizure was limited to property involved in the alleged crime." *Id.* at 450. We think the very same may be said here.[15] The Affidavit of Molnar addresses, somewhat exhaustively, a series of business transactions from which we find probable cause to believe that DSA's business activities were fraught with fraudulent practices, the pervasiveness of which would permeate DSA's business dealings and, therefore, would require proof that was inseparable from DSA's other business records. See, *United States v. Johnson,* 886 F.Supp. 1057, 1072 (W.D.N.Y.1995), citing *United States v. Burke,* 718 F.Supp. 1130, 1139–40 (S.D.N.Y.1989); see also, *Matter of Search of 4801 Fyler Avenue,* 879 F.2d 385, 388 (8th Cir.1989) (implicitly validating a broadly encompassing search, that was conducted pursuant to "a lengthy and detailed affidavit describing a broad range of illegal

---

15. In *Stelten,* the Court relied on language, which was nearly identical to that contained in the Search Warrants here, in concluding that "the searching agents * * * had to limit their seizure of evidence to documents relating to the [suspects] attempt to defraud the government * * *. *United States v. Stelten,* 867 F.2d 446, 450 (8th Cir.1989), cert. denied, 493 U.S. 828, 110 S.Ct. 95, 107 L.Ed.2d 59 (1989). Further, we note that, in *Stelten,* the Court confronted an alleged conspiracy, but no allegations of fraud were at issue. Here, Molnar's Affidavit makes clear that both conspiracy and fraud were the focal points of the document search. See, *Title 26 U.S.C. §§ 7206(1) and (2); Title 18 U.S.C. § 371.* As we have noted, when allegations of fraud are at issue, the Court follows a "practical

accuracy" standard which allows for a degree of flexibility, in the requisite particularity of the Warrant, that is commensurate with the nature of the offense. See, e.g., *United States v. Kail,* 804 F.2d 441, 445 (8th Cir.1986); see also, *United States v. Saunders,* 957 F.2d 1488, 1491 (8th Cir.1992), cert. denied, 506 U.S. 889, 113 S.Ct. 256, 121 L.Ed.2d 187 (1993).

We understand the Defendant to urge that *Stelten* is limited to its facts but we cannot be so elliptical in our approach. The Defendant's criticism of *Stelten* parallels that expressed by the dissent in that case. Nevertheless, and notwithstanding the passage of some six years since its issuance, *Stelten* continues to be the law of this Circuit, and we are not at liberty to casually reject its holding.

activity"), cert. denied, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990).

Moreover, even if we were to accept, for argument's sake, that the Search Warrants suffered from overbreadth, *Stelten* makes clear that the "good faith" exception, which was enunciated in *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984), applies to constitutionally excuse the overbreadth. As was the case in *Stelten*, a comprehensive Affidavit explained the nature of the criminal offenses, that were suspected to have occurred, and the author of that Affidavit, who had extensive experience in investigating such matters, detailed the nature of the evidence to be sought. Of course, we recognize that there are decisions to the contrary, and the Defendant has cited several for our review. See, *United States v. Kow*, 58 F.3d 423, 429–30 (9th Cir.1995); *Center Art Galleries—Hawaii, Inc. v. United States*, 875 F.2d 747, 752–53 (9th Cir.1989); but see, *In Matter of Search of 4801 Fyler Avenue*, supra at 388; *United States v. Oloyede*, 982 F.2d 133, 140–41 (4th Cir.1992); *United States v. Burke*, 718 F.Supp. 1130, 1137 (S.D.N.Y.1989). Our function, however, is not to settle conflicts in the rulings of the various Circuits, but to follow the determinations of our Court of Appeals, and this would seem particularly appropriate where it appears that the Supreme Court has declined, at least at the present time, to resolve the conflict presented. See, *McMonagle v. Northeast Women's Center, Inc.*, 493 U.S. 901, 902, 110 S.Ct. 261, 261–62, 107 L.Ed.2d 210 (1989) (White, J., dissenting). Accordingly, "we cannot find that the warrants were 'so facially deficient * * * that the executing officers [could not] reasonably presume it to be valid.'" *United States v. Stelten*, supra at 451, quoting *United States v. Leon*, supra 468 U.S. at 923.[16]

Therefore, finding no basis upon which to suppress the evidence seized during the execution of the Warrants at issue, we recommend that the Defendant's Motion to Suppress be denied.

NOW, THEREFORE, It is—

ORDERED:

That the Defendant's Motion for the conduct of a *Franks* Hearing is DENIED.

AND, It is—

RECOMMENDED:

That the Defendant's Motion to Suppress [Docket No. 65] be denied.

### NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 7, 1995,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 7, 1995,** unless all interested parties stipulate that the District Court is not required by·

---

16. In this same respect, we recognize, as the Defendant has underscored, that our Court of Appeals' analysis and result in *United States v. Stelten*, 867 F.2d 446, 450–51 (8th Cir.1989), was different from that employed by the Court of Appeals for the Tenth Circuit, upon language in Affidavits which were, essentially, identical. See, *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985). Under similar circumstances, the Courts have found that the "good faith" exception of *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984) applies, since the issue presented was sufficiently difficult

as to "create disagreement among thoughtful and competent judges." *Matter of Search of 4801 Fyler Avenue*, 879 F.2d 385, 389 (8th Cir.1989) ("When judges can look at the same affidavit and come to differing conclusions, a police officer's reliance on that affidavit must, therefore, be reasonable"), quoting *United States v. Martin*, 833 F.2d 752, 756 (8th Cir.1987). As a result, we find no basis to conclude, upon the Record before us, that the agents, who executed the Warrants issued by the Magistrate Judge, acted unreasonably.

Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.